John McCANN,
Plaintiff-Appellee-Cross-Appellant,

v.

T. COUGHLIN, III, et al.,
Defendants-Appellants-Cross-Appellees.

Nos. 393, 568, Dockets 82–2213, 82–2220.

United States Court of Appeals,
Second Circuit.

Argued Nov. 12, 1982.

Decided Jan. 6, 1983.

George C. Perry, Deputy Asst. Atty. Gen.,
Susan L. Yarbrough, Asst. Atty. Gen., New

York City (Robert Abrams, Atty. Gen. of the State of N.Y., George D. Zuckerman, Asst. Sol. Gen., New York City, of counsel), for defendants-appellants-cross-appellees.

Max R. Shulman, New York City (Cravath, Swaine & Moore, Paul M. Dodyk, Robert N. Feltoon, New York City, of counsel), for plaintiff-appellee-cross-appellant.

Before WATERMAN, KAUFMAN and NEWMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Courts and public officials have long rejected the doctrine that a prisoner is a "slave of the state" with only those "rights which the law in its humanity accords to him." *Ruffin v. Commonwealth,* 62 Va. (21 Gratt) 790, 796 (1871). Although the scope of an inmate's rights is necessarily circumscribed, and at times may be further limited by exigencies such as the need to assure prison security, prisoners are not wholly without rights. "There is no iron curtain between the Constitution and the prisons of this country." *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974–2975, 41 L.Ed.2d 935 (1974).

The transition from nineteenth century concepts of prisoners' rights to more enlightened views has led this nation's courts down a lengthy and tortuous path. Justice Frankfurter observed, "It is of the very nature of a free society to advance in its standards of what is deemed reasonable and right." *Wolf v. Colorado,* 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949). In this spirit we have attempted to delineate the fine lines between inmates' rights and the legitimate concerns of prison officials. In 1941 the Supreme Court decided that state prison officials could not screen inmates' habeas corpus petitions. *Ex parte Hull,* 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941). Since *Hull,* courts have recognized the First Amendment rights of prisoners,[1] extended the guarantees of due process[2] and secured a panoply of protections designed to give meaning to the Eighth Amendment prohibition against cruel and unusual punishment.[3] The dispute now before us concerns the extent of a convict's rights in prison disciplinary proceedings. It reaches this Court as the latest in a line of cases focusing on prison discipline which we and the lower federal courts in New York State have considered.

## I. FACTS

Because the underlying circumstances are important to the resolution of this case brought pursuant to 42 U.S.C. § 1983, we set out the facts in some detail.

Vincent McCann[4] was convicted of robbery in New York State and sentenced to two and one-half years imprisonment. He was incarcerated in the Fishkill Correctional Center in July 1978 after a short period of confinement at another prison. Fishkill, a medium security facility located in Beacon, New York, houses inmates in dormitories and single rooms. McCann lived in a single room.

On August 10, 1979, McCann became embroiled in an altercation with an inmate named Tarrats. McCann claims he was awakened at about 9 p.m. when Tarrats

---

1. *See, e.g., Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam); *LaReau v. MacDougall,* 473 F.2d 974 (2d Cir.1972), *cert. denied,* 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973); *Sostre v. McGinnis,* 442 F.2d 178 (2d Cir.1971) (en banc), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972); *Walker v. Blackwell,* 411 F.2d 23 (5th Cir.1969).

2. *See, e.g., Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Mempa v. Rhay,* 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967).

3. *See, e.g., Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Kirby v. Blackledge,* 530 F.2d 583 (4th Cir.1976); *Gates v. Collier,* 501 F.2d 1291 (5th Cir.1974); *Wright v. McMann,* 387 F.2d 519 (2d Cir.1967).

4. For reasons not quite clear, McCann was known as John McCann within the New York State correctional system. John is his brother's name, and the arresting officers apparently confused the two names. This action was brought under the name of John McCann.

tried to force his way past another inmate named O'Brien into McCann's room. Earlier that day McCann had exchanged radios with another prisoner, and Tarrats believed the radio McCann obtained through this transaction belonged to him. According to McCann, Tarrats lunged at him with a knife, and McCann responded by reaching for a chair, and hitting Tarrats over the head with it. When the fight ended, Tarrats was taken to the medical clinic and McCann was removed from his room by two corrections officers. McCann was locked up at the prison's Special Housing Unit.[5] This unit, which is in the center's maximum security wing, is used to confine inmates found guilty of disciplinary violations.

Later that day McCann received a Notice of Report, which is used to inform inmates that they are being charged with violations of prison rules. The notice did not describe the particular infraction with which McCann was charged, but merely identified by code number the rule he was alleged to have broken. McCann, however, had been given a rule book in October 1978, shortly after his admission to Fishkill. This book listed disciplinary violations by code number and detailed each infraction.

A Superintendent's Misbehavior Report was also filled out by one of the guards. This report listed the particular events giving rise to the allegations, and specified the rules which McCann was charged with having violated. McCann was not given a copy of this report.

On Sunday, August 12, McCann was taken back to his cell in the Special Housing Unit after receiving a visit from his wife. He claims that while asleep he fell off the bed and injured his back. He summoned the guard, who called the correctional center medical clinic. Shortly thereafter, nurse Ionie Service came to McCann's cell to examine him. McCann demanded to see a doctor, and refused to cooperate with the nurse. Ms. Service informed McCann that the doctor would not come to his cell, and she asked the guards to restrain him so she could take his blood pressure. The nurse found McCann's blood pressure was normal, and gave him a placebo to placate him. McCann continued to complain about his back throughout that day and the succeeding evening, and repeatedly asked to be examined by a doctor. Every few hours the nurse returned and gave McCann some medication. The doctor never visited him.

The following day, August 13, McCann was scheduled to appear before the center's Adjustment Committee in connection with the fight with Tarrats.[6] When an officer came to escort him to the hearing, McCann complained about his back and maintained that he could not walk because of the pain. After checking with Lt. Charest, the Adjustment Committee chairman, the guard insisted that McCann attempt to walk, and helped support him. McCann got up, but as he started out the door of his cell, he collapsed. He asked the guard to summon the doctor. The guard called, but informed

---

**5.** A Special Housing Unit is "[a] cell or group of cells within a facility, maintained separate and apart from cells used by inmates in the general population, for confinement of inmates who are not in a program that permits them to commingle with the general inmate population." 7 N.Y.C.R.R. § 300.3(b). An inmate confined to special housing is isolated from other inmates and allowed only limited personal belongings. 7 N.Y.C.R.R. § 301.3. Also, the inmate's shower and exercise rights are limited. 7 N.Y.C.R.R. § 301.5. McCann alleged that he was also prohibited from using the correctional center's recreation facilities, and was not allowed to work at his job in the ceramics shop. He was, however, able to receive correspondence and visitors. *See* 7 N.Y.C.R.R. § 301.6.

**6.** An Adjustment Committee is a three member board whose role is "to ascertain the full and complete facts and circumstances of the incidents of inmate misbehavior alleged in reports to the superintendent; to ascertain the underlying causes of each such incident; [and] to take appropriate steps to secure future compliance by such inmates with the policies of the department." 7 N.Y.C.R.R. § 252.2. The Committee is granted limited disciplinary powers, and under current regulations may order that an inmate be confined to his room for a period of up to seven days. 7 N.Y.C.R.R. § 252.5(e).

The Adjustment Committee which considered the charges raised against McCann was composed of Lt. Charest, the chairman, correctional officer John Dooley, and Paul Hannigan, a civilian maintenance supervisor at Fishkill.

McCann that the doctor refused to come to the cell, because "[h]e doesn't make house calls." McCann alleges that Lt. Charest ordered him to be brought to the hearing on a stretcher. The guards attempted to place McCann on a stretcher, but gave up when he cried out in pain. He remained in his cell for approximately two hours until Dr. Bakall arrived and, according to McCann, instructed the guards to ignore his complaints and put him on a stretcher. McCann claims that they pulled him onto the stretcher by his legs despite his cries of pain.

At the clinic Dr. Bakall examined McCann. He attempted to manipulate his legs to determine if anything was wrong, and when he did this, McCann kicked him. McCann stated in his complaint that the doctor was pulling his leg and causing him pain. McCann claims he tried to free his leg from the doctor's grasp, and accidentally struck him. The district court rejected this version of the facts and credited Dr. Bakall's testimony. After McCann was examined further and X-rays were taken, the doctor found nothing medically wrong. McCann was returned to the Special Housing Unit in a wheelchair.

Later that day, McCann received a second Notice of Report in connection with the assault on Dr. Bakall. This notice, like the first one, did not specify the infractions with which McCann was charged, but only indicated by code number the rules he allegedly violated. It also stated that a Superintendent's Misbehavior Report was being filed. This latter report, listed the alleged misconduct in some detail, but McCann was not provided with a copy.

As a consequence of his collapse, McCann never attended the scheduled Adjustment Committee hearing on August 13. Two reports, however, were filed by Lt. Charest which seem to indicate that McCann did attend the hearing. In the appropriate space, Charest wrote in one report that McCann explained his involvement in the fight with Tarrats by stating, "[i]ts my age." The other report contained a space where McCann should have signed. Lt.

Charest wrote there, "[i]nmate passed out, could not sign."

On August 14 McCann finally appeared before the Adjustment Committee. At the district court trial, which we shall soon discuss, McCann testified that as soon as he arrived at the Adjustment Committee hearing, he was told by Lt. Charest that he was being sentenced to seven days keeplock in the Special Housing Unit. McCann stated that he asked to be allowed to present his version of the events, but was interrupted and told the Committee would move ahead and consider the second alleged violation, the one concerning McCann's assault on Dr. Bakall. McCann also testified at trial that he was acting in self-defense when he hit Tarrats, and he indicated that a fellow inmate, O'Brien, would have corroborated this claim. McCann did not ask to call O'Brien as a witness, because he believed the Committee would not permit it. He testified that he did not know he had a right to call witnesses, and thought it would be futile to make a request.

When the Committee considered the second charge against McCann, he was allowed to explain his side of the story. He stated that the doctor was hurting him by moving his leg, and he accidentally kicked the doctor as he tried to pull his leg away. The Adjustment Committee listened to this testimony and adjourned without reaching a decision.

The following day, August 15, McCann was again summoned before the Adjustment Committee. The Committee members did not ask him for any further information concerning the incident with Dr. Bakall, but informed him that he was being sentenced to an additional seven days keeplock with loss of privileges for that violation. At neither hearing was McCann given any reasons for the Committee's decision, nor did he receive a statement of the evidence relied upon.

## II. JUDICIAL PROCEEDINGS

On November 1, 1979 McCann filed a pro se complaint in the Southern District of New York pursuant to 42 U.S.C. § 1983

alleging violations of his rights under the Eighth and Fourteenth Amendments. He sought monetary damages, an injunction and declaratory relief. The defendants named in the complaint were T. Coughlin III, the Commissioner of Corrections; T. Reid, the superintendent of the Fishkill Correctional Center; Lt. Charest, chairman of the Adjustment Committee at Fishkill; and Drs. Huang and Bakall, both physicians at Fishkill.

McCann's complaint alleged that his Eighth Amendment right to be protected from cruel and unusual punishment had been violated because the defendants caused him excessive and unnecessary suffering through their indifference to his medical needs. Specifically, he asserted that the prison physicians refused to come to his assistance when he fell from his bed on August 12, and that they treated him improperly on August 13. His claim under the Fourteenth Amendment was premised on his allegation that the Adjustment Committee violated his due process rights and imposed excessive sanctions for the two disciplinary violations.

The defendants moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). Judge Pierce referred the motion to Magistrate Tyler, who recommended that the claim of disproportionate punishment be dismissed, but found sufficient allegations to sustain the other claims. Judge Pierce adopted the magistrate's recommendations, and later requested the distinguished firm of Cravath, Swaine & Moore ("Cravath") to represent McCann. Cravath agreed to represent McCann as a pro bono client.

The case was eventually tried before Judge Brieant in April 1982. McCann testified in his own behalf. Partial transcripts of a number of depositions were also introduced. The defendants called six witnesses, Lt. Charest, Ms. Service, Dr. Bakall, former Adjustment Committee member Dooley and two Fishkill correctional officers. After the close of the defendants' case Judge Brieant dictated his findings of fact and conclusions of law. He rejected McCann's Eighth Amendment claim, finding that McCann received appropriate medical care. The doctors were not indifferent to McCann's medical needs, the court found, and they "treated him fairly and correctly under all the circumstances." The judge also found that McCann acted in a manner inconsistent with that of a person genuinely injured, and described him as "obstreperous" and a "wise guy."

Judge Brieant determined that McCann's due process rights had been violated because of the procedures employed by the Adjustment Committee. He found that McCann was not given sufficient notice of the charges raised against him, and was not provided with a written explanation of the Committee's decision. The court concluded, however, that although the notice given McCann was inadequate, he was aware of the nature of the charges against him, and he could have used the rule book in his possession to apprise himself of the particular violations with which he was charged.

The district judge rejected McCann's assertion that his rights were infringed because he was not allowed to call witnesses or present a defense concerning the Tarrats incident at the August 14 hearing. Judge Brieant concluded that McCann either waived his right to call a witness and present a defense, or alternatively, that there was no defense available to him. The court also declined to find that the Adjustment Committee reports indicating that McCann had appeared on August 13, when in fact he did not appear, were fraudulently prepared. The judge viewed the misstatements in the reports "as something in the nature of a clerical error."

Judge Brieant also rejected the good faith defense raised by the defendants, holding that they had either actual or constructive notice of court decisions concerning the due process rights of inmates at disciplinary proceedings. Moreover, Commissioner Coughlin or his predecessors had been parties in several proceedings in which this court delineated the nature and scope of prisoners' rights in Adjustment Committee hearings.

Considering McCann's claim for damages, Judge Brieant concluded that McCann did not meet his burden of demonstrating that the due process violations actually caused him injury. The district judge stated that even "with all the due process in the world granted to him, the [A]djustment [C]ommittee would probably still have imposed the same or greater punishment upon Mr. McCann." Accordingly, Judge Brieant refused to award compensatory damages, and ordered the payment of $1 nominal damages. Defendants Coughlin, Charest and Reid were held jointly and severally liable for this amount. The judge also refused to award punitive damages, and indicated that the defendants' conduct, though willful and intentional, was not malicious. Finally, the district judge declined to order injunctive or declaratory relief, noting that McCann had been released from Fishkill in September, 1981.

The court also awarded attorney's fees and costs to McCann, rejecting the defendants' claim that he won only a technical victory, as evidenced by his inability to prove damages. Accordingly, the Cravath firm was directed to supply the court with affidavits and other documentary evidence so that an assessment of reasonable attorney's fees could be made. A partner of Cravath submitted an affidavit in which he outlined the services provided by the firm in their representation of McCann. The affidavit indicated that a total of 662 attorney hours were spent preparing the case, of which 50 hours were duplicative because of lawyer reassignments. Hence, counsel requested compensation for the remaining 612 hours. The firm sought payment of fees at a rate of $60 an hour, indicating that this was significantly less than the rate which Cravath charged its commercial clients. The firm also asked reimbursement for 380 hours of nonlegal time, and for various disbursements. Counsel indicated that the $49,591.27 requested was merely a suggestion, and stated that Cravath would not contest whatever award the court decided was appropriate.[7] He also offered to provide additional documentation upon request.

Judge Brieant denied the defendants' request for an evidentiary hearing on the proposed award of attorney's fees. He also refused to reduce the amount Cravath requested, noting that while an adjustment would usually be made in a case where the plaintiff did not prevail on all his claims, a reduction would be inappropriate in this case. The judge stated that because of its customary fees and high standing in the bar, Cravath could have requested fees at twice the proposed $60 an hour rate. Accordingly, he determined that a fee reduction would be "useless."

Both parties appeal from various aspects of the judgment entered on Judge Brieant's order. McCann challenges several of the court's factual findings, specifically the court's finding that he waived his right to call a witness and present a defense, and the judge's determination that the documents concerning the August 13 Adjustment Committee hearing were not intentionally falsified. McCann also asserts that the judge erred in denying his claim for both compensatory and punitive damages. The defendants contend that Judge Brieant improperly rejected their good faith defense. They also challenge the court's award of attorney's fees.

We will discuss these claims seriatim.

## III. DUE PROCESS RIGHTS

Our threshold question, as in all cases where an individual claims his due process rights have been violated, is whether the alleged deprivation is substantial enough to invoke the protections of the Due Process Clause. In considering this issue, we examine the state of the law in 1979, when the Adjustment Committee hearings of which McCann complains took place.

---

7. The fee award was based on the following breakdown of costs and expenses:

| | |
|---|---|
| legal fees, 612 hours @ $60 an hour | $36,720.00 |
| nonlegal time, 380 hours @ $15 an hour | 5,700.00 |
| transcript expenses | 4,553.05 |
| other disbursements | 2,618.22 |
| total | $49,591.27 |

We have previously held that keeplock that could be imposed for as long as fourteen days is a sufficiently serious deprivation to accord an inmate due process protections. *McKinnon v. Patterson,* 568 F.2d 930 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). The deprivation we considered in *McKinnon* was less substantial than that involved in the present case. In *McKinnon* we understood keeplock to refer to the practice of restricting an inmate to his own room, and although the parties in this case have referred to the punishment meted out to McCann as "keeplock," it is undisputed that McCann was not merely confined to his room, but was restricted to the Special Housing Unit.

Confinement in special housing is a more significant deprivation of an inmate's liberty than restriction to his usual quarters. The prisoner is confined to a maximum security area of the correctional center and is separated from most of his personal belongings and other items. Also, it appears from the record that an inmate's quarters in the Special Housing Unit are more sparsely furnished than those ordinarily occupied. These differences have led us to indicate that punishment of the type inflicted upon McCann is sufficient to invoke due process protections.[8] *See, e.g., United States ex rel. Larkins v. Oswald,* 510 F.2d 583 (2d Cir.1975); *United States ex rel. Walker v. Mancusi,* 467 F.2d 51, 54 (2d Cir.1972).

■ The Fishkill Adjustment Committee sentenced inmates to a maximum period of seven days confinement in special housing.[9] There was evidence, however, that the Committee on occasion extended this confinement for successive seven day periods. Thus, if confinement in a Special Housing Unit was not itself sufficient to invoke due process requirements, the discretionary authority of an Adjustment Committee to sentence an inmate to several successive seven day sentences would bring the Committee's action within the scope of our holding in *McKinnon, supra.* Also, in 1979 Adjustment Committees could order a prisoner to be restricted to his own quarters for up to fourteen days. 7 N.Y.C.R.R. § 252.5(e)(2) (superseded 1980). This, of course, places the Committee's action squarely within our decision in *McKinnon.*

■ We conclude, therefore, that an inmate who is or may be sentenced to a term of confinement in a Special Housing Unit has a right to the procedural protections of the Due Process Clause. A prisoner who may be confined to his quarters or elsewhere for at least fourteen days also has a right to these safeguards.

■ The Supreme Court has delineated the due process rights which must be accorded a prisoner in disciplinary hearings. He has a right to at least 24 hours advance notice of the charges against him, and must be informed of the reasons for the action taken, and the evidence relied upon by the Committee in reaching its decision. *Wolff v. McDonnell, supra,* 418 U.S. at 564, 94 S.Ct. at 2978. *See also Powell v. Ward,* 487 F.Supp. 917 (S.D.N.Y.1980) (*"Powell II"*), *aff'd as modified,* 643 F.2d 924 (2d Cir.) (per curiam), *cert. denied,* 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981); *McKinnon v. Patterson, supra; Crooks v. Warne,* 516

---

8. The Supreme Court left this question unsettled in *Wolff v. McDonnell, supra.*

9. The parties agree that in 1979 the Fishkill Adjustment Committee confined inmates to special housing as a punishment. The legal basis for this is unclear. Regulations effective in 1979 only authorized the Committee to confine a prisoner in the Special Housing Unit as a temporary measure until a Superintendent's Proceeding could be convened.

> Where the inmate's behavior is such that his presence in a general housing unit disrupts the order of that unit or is inconsistent with the best interests of the facility or of the inmate, [the Adjustment Committee may confine the inmate] in a special housing unit; provided, however, that in such case the adjustment committee ... shall immediately recommend to the superintendent that a superintendent's proceeding be held.

7 N.Y.C.R.R. § 252.5(e)(3). The Fishkill Committee apparently ignored the requirement of recommending a Superintendent's Proceeding and routinely ordered inmates to be confined in special housing as a punishment.

F.2d 837 (2d Cir.1975). An inmate also has the right to call witnesses and present evidence in his defense, "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals." *Wolff v. McDonnell, supra,* 418 U.S. at 566, 94 S.Ct. at 2979. *See also Powell v. Ward,* 392 F.Supp. 628 (S.D.N.Y.1975) (*"Powell I"*), *aff'd as modified,* 542 F.2d 101 (2d Cir. 1976); *Powell II, supra.* Further, while the Supreme Court has not explicitly reached this issue, we have held that members of the Adjustment Committee must be fair and impartial. *Crooks v. Warne, supra; Powell I, supra; McKinnon v. Patterson, supra,* 568 F.2d at 933–34 n. 3. *See also Morrissey v. Brewer,* 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972).

▮ Each of these rights is fundamental to our system of justice and an important aspect of fair adjudication. At the same time, prison disciplinary committees are not required to grant full procedural protections such as those afforded at a criminal trial. An inmate's rights are necessarily limited by the fact of confinement. Prison officials, nonetheless, are required to afford him fundamental procedural protections before his liberty is restricted in a significant or substantial manner beyond those limitations imposed by virtue of his

incarceration. *See Wolff v. McDonnell, supra; Sostre v. McGinnis,* 442 F.2d 178, 194–99 (2d Cir.1971) (en banc), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972).

Accordingly, McCann had a right to basic due process protections when he was summoned before the Adjustment Committee on August 14 and 15.

## IV. CHALLENGES TO THE DISTRICT COURT'S FACTUAL FINDINGS

▮ The parties do not seriously question the extent of the rights which are guaranteed an inmate such as McCann. Rather, the dispute focuses on Judge Brieant's factual findings. McCann claims the court's finding that he waived his right to call witnesses and present a defense is clearly erroneous. McCann also challenges the lower court's conclusions that a clerical error could explain the misstatements in the documents indicating that he appeared before the Adjustment Committee on August 13.[10]

▮ The evidence adduced at trial clearly demonstrated that no prisoner had ever been allowed to call witnesses before the Adjustment Committee.[11] Committee

---

**10.** McCann also contends that the district court erred in not ruling on his claim that his due process rights were violated because Adjustment Committee members participated in investigating the charges raised against him. While such a claim, if established, would constitute an additional due process violation, *see Morrissey v. Brewer,* 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972); *Powell I, supra,* we see no evidence that McCann raised this issue in either his complaint or in his proposed findings of fact and conclusions of law. Accordingly, the district court did not err in refusing to rule on this issue.

**11.** Lt. Charest, chairman of the Adjustment Committee, testified as follows:

Q. At the time that the notice of report is delivered to the inmate, is the inmate told that he can call witnesses to testify at an Adjustment Committee hearing?

A. I don't believe so. There is [sic] no provisions for witnesses at the Adjustment Committee.

\* \* \* \* \* \*

Q. Do witnesses ever testify at Adjustment Committee hearings?

A. No.

\* \* \* \* \* \*

Q. Do inmates ever request to call witnesses to appear at Adjustment Committee hearings?

A. Once in a while.

Q. What do you tell those inmates?

A. That it is not part of the Adjustment Committee process.

Superintendent Reid also stated that inmates were not allowed to call witnesses before the Adjustment Committee:

Q. Does the Adjustment Committee ever call . . . witnesses to testify in the presence of the inmate being charged?

A. They do not.

\* \* \* \* \* \*

Q. Do you know whether at a reappearance hearing, whether any witnesses testify?

A. Witnesses are never called before the Adjustment Committee in the presence of an inmate.

members did not tell prisoners that they could call witnesses, and indeed, inmate requests were uniformly denied. McCann never asked whether he could bring a witness to corroborate his claim of self-defense. At trial he accounted for this failure by stating that he did not think it would be allowed.[12]

The district court did not explain its conclusion that McCann waived this right. In the absence of any evidence to support this finding, and on the basis of the overwhelming and uncontradicted evidence that prisoners at Fishkill had never been allowed to call witnesses, the district court's finding must be rejected. McCann cannot be seen as having waived his right by not asking to bring a witness. He reasonably believed, and indeed it is clear, that his request would have been refused. Moreover, the narrow exception to this right carved out by *Wolff* concerns only the unusual situation where allowing an inmate to call a witness would jeopardize institutional safety. This exception has no relevance to this case, where inmates were never permitted to call witnesses.

Judge Brieant's alternative finding, that McCann had no defense, is likewise unsupported by the evidence. McCann did have a claim to present to the Adjustment Committee, but was never allowed to assert it. He contends that he acted in self-defense. At trial he testified that when he tried to raise this claim at the August 14

hearing, he was interrupted, and told that the Committee would proceed to consider the second charged violation. There was no evidence introduced at trial which contradicted this assertion. None of the defendants' witnesses testified that McCann was able to recount his version of the events of August 10, or indicated that he was given an opportunity to explain and failed to do so.

Accordingly, we are "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). The court's finding that McCann either waived his right to present a defense and call witnesses, or that he had no defense is clearly erroneous. We are reluctant to reverse a factual finding by the district court, but if the clearly erroneous standard is to have any significance, we cannot accept a finding that is completely unsupported by the evidence, and, indeed, is contradicted by overwhelming evidence.

We decline to reverse the district court's finding on McCann's second challenge. There is no dispute that the statements contained in the August 13 Adjustment Committee reports were false. McCann did not appear before the Committee on that date, and the indications in the reports that he appeared, explained the reasons for the fight with Tarrats, and passed out, are incorrect. The district judge, however, found that these reports were not

Corrections officer Dooley, who was a member of the Committee which considered the charges against McCann, testified similarly:
Q. Is the inmate informed by the Adjustment Committee that the inmate can call witnesses to testify in his behalf?
A. No, when I was on, he couldn't call witnesses.
Q. The inmate could not call witnesses?
A. No, no witnesses.
Q. Then I am correct that witnesses do not testify at Adjustment Committee hearings?
A. No.
Q. Other than the inmate?
A. Other than the inmate.
Q. You never saw a witness testify other than an inmate?
A. A witness? Not that I can recall, no.

\* \* \* \* \* \*
Q. So what you are saying then that the request was denied for—when an inmate would say, "I would like to call such and such a witness."?
A. Just tell him that it was not allowed.

12. At trial McCann identified the witness he would have called as Anthony O'Brien. He did not, however, take O'Brien's deposition or seek to call him as a witness. While this may reflect the strength of McCann's claim, it does not address the failure of the Adjustment Committee to allow him to call O'Brien as a witness. The right to call witnesses at a disciplinary hearing may not be abrogated simply because the witness's testimony might later be found unpersuasive.

intentionally falsified. There is evidence in the record which supports this finding. McCann had contact with at least one member of the Adjustment Committee on August 13. In his pro se complaint, where he recounts the events leading up to his collapse and his trip to the medical clinic, McCann refers to several remarks made by Lt. Charest, chairman of the Adjustment Committee. It is possible that the statement appearing in the first report concerning McCann's explanation of the fight, reflects a communication McCann made to Charest on August 13. The statement in the second report, that McCann was unable to sign because he passed out, may be viewed as an explanation for the failure to hold the first hearing.

■ McCann did not introduce any evidence at trial to prove that the August 13 Adjustment Committee reports were intentionally falsified. In the absence of any such evidence, and because of an explanation for the false statements, we have no basis for holding the district court's finding clearly erroneous. We are particularly reluctant to find a district court finding clearly erroneous where that finding concerns motive or intent. *See United States v. Yellow Cab Co.,* 338 U.S. 338, 341, 70 S.Ct. 177, 94 L.Ed. 150 (1949); *Palermo v. Warden, Green Haven State Prison,* 545 F.2d 286, 293 (2d Cir.1976), *cert. dismissed,* 431 U.S. 911, 97 S.Ct. 2166, 53 L.Ed.2d 221 (1977).

## V. OFFICIAL GOOD FAITH IMMUNITY

The defendants challenge the district court's rejection of their claim of official good faith immunity. The state of the law concerning an inmate's rights at disciplinary hearings, they assert, was unclear in 1979, and they could not have known that the procedures employed by the Adjustment Committee were unconstitutional. They contend that they acted in good faith, believing their actions to be lawful, and accordingly, they should not be liable for damages.

■ State officials have a right to qualified immunity for actions taken in their official capacity if they act in good faith and on the basis of a reasonable belief that their actions were lawful. *Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1691–1692, 40 L.Ed.2d 90 (1974); *Wood v. Strickland,* 420 U.S. 308, 318–22, 95 S.Ct. 992, 998–1000, 43 L.Ed.2d 214 (1975). This qualified immunity has been interpreted to protect prison officials. *Procunier v. Navarette,* 434 U.S. 555, 561–62, 98 S.Ct. 855, 859–860, 55 L.Ed.2d 24 (1978). Officials are not required to predict future developments in constitutional adjudication, and can be held liable only for actions which were unlawful at the time in issue. *Procunier v. Navarette, supra,* 434 U.S. at 562, 565, 98 S.Ct. at 859, 861; *Pierson v. Ray,* 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967). State officials, however, may be charged with constructive knowledge of the established law at that time. *See Wood v. Strickland, supra,* 420 U.S. at 322, 95 S.Ct. at 1000; *Procunier v. Navarette, supra,* 434 U.S. at 562, 98 S.Ct. at 860.

■ The defendants assert that the state of the law concerning the scope of inmates' due process rights in institutional disciplinary hearings was unclear in 1979, and point to our opinion in *McKinnon v. Patterson, supra,* 568 F.2d at 934–35, where we noted, "[a]t the time of the hearings in question the contour of prisoners' procedural rights were just starting to take shape." This statement was an accurate reflection of the events we considered in *McKinnon.* That case, however, concerned events which occurred in 1973, and antedated not only the Supreme Court's decision in *Wolff v. McDonnell, supra,* but also our own decisions in *Crooks v. Warne, supra; Powell I, supra;* and *Mawhinney v. Henderson,* 542 F.2d 1 (2d Cir.1976). In each of these decisions, all of which were rendered before 1979, we carefully delineated the scope of an inmate's rights in Adjustment Committee and other disciplinary proceedings. In 1979 an inmate facing a disciplinary hearing which could deprive him of substantial rights had an unequivocal right to adequate notice, an impartial tribunal and written statement of reasons and evidence relied

upon. Moreover, our decisions and the *Wolff* decision established the qualified right we have discussed, to present witnesses before an Adjustment Committee.

 The defendants also argue that even if the nature of an inmate's due process rights was clear in 1979, it was uncertain whether these procedural protections were required in an Adjustment Committee proceeding, where only limited sanctions could be imposed. Whatever slight uncertainty there might have been, however, is insufficient to provide a basis for a legitimate claim of good faith immunity. In previous decisions, we noted that confinement in special housing was a substantial deprivation, even more so than confinement in the inmate's living unit. For example, in *McKinnon v. Patterson, supra,* 568 F.2d at 930, we referred to our earlier decision in *United States ex rel. Walker v. Mancusi, supra,* and stated, "we implicitly found segregation in a special housing unit to be a substantial deprivation . . . ." The *McKinnon* opinion was rendered in 1977, well before the events complained of in this proceeding. Also, a 1975 district court opinion which we affirmed held that the *Wolff* requirements applied to all disciplinary proceedings in which a prisoner could be confined to a Special Housing Unit. "We conclude that *Wolff* procedures must be followed for both Adjustment Committee Proceedings and Superintendent's Proceedings, and . . . for all proceedings which may result in confinement in special housing." *Powell I, supra,* 392 F.Supp. at 632. Moreover, in 1979 the Committee could restrict a prisoner to his quarters for as long as two weeks, and in *McKinnon, supra,* we explicitly stated that this was sufficient to invoke due process protections.

Although the defendants were not required to anticipate future developments in the field of inmates' due process rights, neither could they narrow the holding of each of the previously decided cases to the particular facts presented to the court in those cases, and claim that the details of the present situation are different in some minor or insignificant way. Our prior decisions were clearly meant to be generally applicable, and they should have been read in that light. Indeed, in *Crooks v. Warne, supra,* 516 F.2d at 840, we vacated the judgment of the district court noting, "it is desirable that there be uniform rules applicable to all inmates . . . and such rules are supplied by the decision [in *Powell I*]." Accordingly, we reject the defendants' claim of official good faith immunity.

Commissioner Coughlin and Superintendent Reid further contend that the district court improperly held them liable in the absence of any evidence of their direct or personal involvement in the Adjustment Committee proceedings. They assert that they were impermissibly found liable on the basis of a *respondeat superior* theory.

 The district court found that Commissioner Coughlin had either actual or constructive notice of the Adjustment Committee procedures as they were employed at Fishkill. The defendants have not challenged this finding, and we accept it as true. Superintendent Reid may also be fairly viewed as having had at least constructive notice of the practices employed at the correctional center he controlled. The defendants' *respondeat superior* argument is therefore unavailing, because both Coughlin and Reid had a sufficient degree of personal involvement in the unlawful practices of the Adjustment Committee. They were found liable not for the actions of their agents, but rather for their "gross negligence" and "deliberate indifference" to the constitutional rights of inmates at Fishkill, as indicated by their knowledge that unconstitutional practices were taking place, and their failure to act on the basis of this information. *See Owens v. Haas,* 601 F.2d 1242, 1246 (2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979). This is an adequate basis for liability pursuant to 42 U.S.C. § 1983. *Owens v. Haas, supra; see Duchesne v. Sugarman,* 566 F.2d 817 (2d Cir.1977).

Accordingly, the district court properly rejected the defendants' claim of official good faith immunity and did not err in rejecting the additional defense raised by defendants Coughlin and Reid.

## VI. DAMAGES

■ It is well established that to collect compensatory damages in an action brought pursuant to 42 U.S.C. § 1983, a plaintiff must prove more than a mere violation of his constitutional rights. He must also demonstrate that the constitutional deprivation caused him some actual injury. *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *see Wheatley v. Beetar,* 637 F.2d 863 (2d Cir.1980). When a plaintiff is unable to prove causation, he may collect only nominal damages. *Carey v. Piphus, supra.* The district court declined to award McCann compensatory damages because it found that McCann had not met this burden. Accordingly, it awarded only $1 in nominal damages.

The district court concluded that McCann's due process rights had been violated in two respects. McCann was not given adequate notice of the charges against him. Also, he was not provided with a written statement of the reasons for the Committee's action and the evidence it relied upon. McCann claims the court erred in determining that he did not meet his burden of proving that these two violations resulted in his confinement as punishment for the fight with Tarrats. He does not challenge the court's failure to award compensatory damages for his confinement arising out of the incident involving Dr. Bakall.

■ The two due process violations found by the district court do not directly bear on the integrity of the Adjustment Committee's decisionmaking process. Although McCann should have been provided with a more complete notice of the charges against him, the court found that he could have informed himself of the nature of the allegations by comparing the code numbers for the violations listed on the Notice of Report with those contained in his rule book. Moreover, it is inconceivable that McCann was not aware of the substance of the charges against him. He was brought to the Special Housing Unit immediately after the fight with Tarrats was broken up, and received the Notice of Report that same day. Thus, the failure to provide McCann with a more detailed explanation of the alleged disciplinary violations cannot be seen as the cause of his confinement. Whatever steps he might have taken had he received sufficient notice, he could equally well have taken on the basis of his independent knowledge of the charges.

Similarly, the failure to provide McCann with a written statement of the Committee's decision and underlying reasons could not have caused his injury. If he had received such a written statement, it would have been after the Committee rendered its decision. *Carey v. Piphus, supra,* clearly establishes that McCann has an obligation to prove how the constitutional deprivations he suffered caused his injury. He failed to sustain his burden on this issue.

■ The district court, however, never considered whether the Adjustment Committee's failure to allow McCann to call his witness or present his defense could have caused his confinement.[13] McCann introduced evidence at trial to establish that he would not have been confined in special housing had he been allowed to call a witness and present a defense at the August 14 hearing. At trial he stated that he hit Tarrats in self-defense. Tarrats, McCann claimed, attacked him with a knife and attempted to take his radio. Moreover, McCann testified that O'Brien was standing by the door of McCann's room when Tarrats burst in, and he indicated that O'Brien would corroborate McCann's version of the events. This evidence directly bears on

---

**13.** The district court found that "with all the due process in the world granted to him, the [A]djustment [C]ommittee would probably still have imposed the same or greater punishment upon Mr. McCann arising out of the episodes in which he participated." This finding, however, should be read with reference to the two due process violations which the court found. As we have indicated, these violations do not directly affect the Committee's decisionmaking process, and thus would not have affected the outcome of the hearing. We do not read the district court's finding as also referring to those due process violations which the judge did not find present, such as the denial of the right to call a witness and present a defense.

McCann's culpability. If he were attacked by Tarrats, he could have asserted a justification for protecting himself and his property. The Adjustment Committee might have determined that McCann should not be punished for his role in the fight had they heard his version of the facts. There is, of course, no assurance that the Committee would have believed McCann, and even if it did, it might still have imposed some sanction.

It is, however, not our role to weigh this evidence and decide whether its introduction before the Adjustment Committee would have changed the conclusion. The district court did not make any finding on this issue, and there should be a ruling whether McCann met his burden of proving causation on the record already established. The district court, of course, has discretion to permit reopening and further development of the record. If the court finds that McCann would have received a lesser sentence, or perhaps would not have had any sanctions imposed if the Adjustment Committee had considered this additional evidence, then it should consider the monetary value of McCann's damages, if any. *See Carey v. Piphus, supra.*

McCann also contends that the district court applied an improper legal standard in rejecting his claim for punitive damages. McCann argues that the district court employed a malice test, pursuant to which a plaintiff must demonstrate that the defendants acted with malice or in bad faith to recover punitive damages. The appropriate standard, McCann claims, is not malice, but rather "reckless disregard." Under this test, a § 1983 plaintiff may recover punitive damages if he shows that the defendants acted in reckless disregard or with actual knowledge that they were violating his rights.

The standard for recovery of punitive damages in § 1983 actions remains unsettled. The Circuits have split almost evenly on this issue,[14] and there has been no definitive guidance from the Supreme Court.[15] This Circuit has not clearly addressed the issue.

The district court concluded there was no malice or bad faith on the part of the defendants, but did not explicitly deny punitive damages on that basis. It is, of course, axiomatic that the district courts are vested with discretionary authority in considering the propriety of punitive damages awards, and a denial will be reversed only for an abuse of discretion. *See Fort v. White,* 530 F.2d 1113, 1117 (2d Cir.1976); *Stolberg v. Members of the Board of Trustees for the State Colleges of Connecticut,* 474 F.2d 485, 489 (2d Cir.1973). Given the unsettled state of the law on this issue, the absence of any clear indication that Judge Brieant employed an incorrect standard, and the discretion vested in the district courts, we decline to find that the district court's decision not to award McCann punitive damages was an abuse of discretion.

## VII. ATTORNEY'S FEES

The principal challenge which the defendants raise concerns Judge Brieant's award

---

**14.** McCann's claim is supported by the Third, Fifth, Eighth, Ninth and Tenth Circuits. *See, e.g., Cochetti v. Desmond,* 572 F.2d 102, 106 (3rd Cir.1978); *Woods-Drake v. Lundy,* 667 F.2d 1198, 1203 (5th Cir.1982); *Wade v. Haynes,* 663 F.2d 778, 786 (8th Cir.1981) (malice inferred from "reckless and callous disregard"), *cert. granted sub nom. Smith v. Wade,* 456 U.S. 924, 102 S.Ct. 1968, 72 L.Ed.2d 439 (1982); *Phiffer v. Proud Parrot Motor Hotel, Inc.,* 648 F.2d 548, 553 (9th Cir.1980); *Silver v. Cormier,* 529 F.2d 161 (10th Cir.1976). The First, Fourth, Sixth and Seventh Circuits require a showing of malice before punitive damages will be awarded. *See Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 121 (1st Cir.

1977); *Haywood v. Ball,* 634 F.2d 740, 743 (4th Cir.1980); *Morrow v. Igleburger,* 584 F.2d 767, 769 (6th Cir.1978), *cert. denied,* 439 U.S. 1118, 99 S.Ct. 1027, 59 L.Ed.2d 78 (1979); *Endicott v. Huddleston,* 644 F.2d 1208, 1217 (7th Cir.1980).

**15.** Justice Brennan in his opinion concurring in part and dissenting in part in *Adickes v. Kress & Co.,* 398 U.S. 144, 232–33, 90 S.Ct. 1598, 1641–1642, 26 L.Ed.2d 142 (1970) indicated that no more than an intentional deprivation of a person's constitutional rights is required to support a punitive damage award. The full Court may decide this issue when a decision is rendered in *Smith v. Wade, supra.*

of almost $50,000 to McCann's attorneys. They claim the district court awarded attorney's fees on the basis of inadequate documentation, and that the award was too high because McCann did not prevail on all of his claims, and was awarded only $1 in nominal damages.

Awards of attorney's fee are provided for in § 1983 suits pursuant to 42 U.S.C. § 1988. This section states in relevant part, "[i]n any action or proceeding to enforce a provision of [section 1983 of this title,] the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." Fee awards take on particular importance in actions brought pursuant to the civil rights laws, which rely in large part on private actions to ensure compliance with their provisions. The legislative history of § 1988 indicates a strong Congressional intent to encourage private enforcement of the nation's civil rights statutes, and to award attorney's fees to prevailing parties.

> If private citizens are to be able to assert their civil rights, and if those who violate the Nation's fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court.... If the cost of private enforcement becomes too great there will be no private enforcement. If our civil rights laws are not to become mere hollow pronouncements which the average citizen cannot enforce, we must maintain the traditionally effective remedy of fee shifting in these cases.

S.Rep. No. 1011, 94th Cong., 2d Sess. 2, 6 (1976), reprinted in 1976 U.S.Code Cong. & Ad.News 5908, 5910, 5913. Awards of fees to attorneys are particularly important in cases alleging due process violations, because of the difficulty of proving and recovering actual damages.

Judge Jerome Frank cautioned that "repeated and unredressed attacks on the constitutional liberties of the humble will tend to destroy the foundations supporting the constitutional liberties of everyone." *United States ex rel. Caminito v. Murphy,* 222

F.2d 698, 706 (2d Cir.), *cert. denied,* 350 U.S. 896, 76 S.Ct. 155, 100 L.Ed. 788 (1955). Mindful of this admonition, our decisions concerning grants of attorney's fees in civil rights cases have assured that the humble will have a full opportunity to press their claims and guarantee the protection of their rights.

The articulated Congressional policy of encouraging meritorious private civil rights actions does not, of course, imply that fees must always be awarded in § 1983 cases. Our starting point is the language of the Act which restricts awards to prevailing parties. This requirement, however, has been construed to effectuate the broad remedial purpose of the statute. *See Mid-Hudson Legal Services, Inc. v. G & U, Inc.,* 578 F.2d 34, 37 (2d Cir.1978). Our decisions indicate that an award is not barred merely because the action was settled or the plaintiff was awarded only nominal damages. *See, e.g., Gagne v. Maher,* 594 F.2d 336 (2d Cir.1979) (attorney's fee award upheld where case was settled), *aff'd,* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980); *Milwe v. Cavuoto,* 653 F.2d 80, 84 (2d Cir. 1981) (court awards fees where plaintiff recovers only $1). *See also Skoda v. Fontani,* 646 F.2d 1193 (7th Cir.1981) (per curiam); *Burt v. Abel,* 585 F.2d 613 (4th Cir. 1978) (per curiam). A court need not grant a fee request where the plaintiff has only marginally prevailed and received nominal damages. The statute vests discretionary authority in the district court to consider whether fees should be awarded, and the degree to which the plaintiff prevailed is a factor that the courts may consider in exercising this discretion. *Huntley v. Community School Board of Brooklyn,* 579 F.2d 738 (2d Cir.1978) (per curiam).

The policy underlying the statute is to encourage litigants to assume the role of a private Attorney General. This policy may be served by granting a fee request even where a plaintiff is unable to prove actual damages resulting from his constitutional deprivation. The Supreme Court's decision in *Carey v. Piphus, supra,* makes clear that a party may prove a violation of

his due process rights and still be unable to show the requisite causation required for an award of compensatory damages. The fact that a plaintiff is awarded only nominal damages does not indicate that he has been unsuccessful or has not prevailed on his claim. Accordingly, the district court did not err in declining to reduce the requested fee award simply because McCann was awarded only $1 in nominal damages.

 The particular form of relief a § 1983 plaintiff seeks or is awarded is also not dispositive of the fee issue. Often a plaintiff such as McCann seeks wide-ranging injunctive relief, and if he succeeds will not only vindicate his own rights, but also those of third parties. A plaintiff who is successful in establishing certain practices as violative of his constitutional rights will deter officials from continuing this conduct, and thereby help assure that others are not subjected to similar constitutional deprivations. This deterrent effect of successful § 1983 actions is wholly independent of the relief which the plaintiff seeks or is ultimately awarded, and therefore it is inappropriate to condition attorney's fee awards on the nature of the relief granted. Judge Brieant properly did not reduce the award of attorney's fees although McCann did not succeed on his request for an injunction.

Different considerations are implicated when we determine whether there should be a reduction of a fee request if the plaintiff has not prevailed on all of his claims. The statute sheds little light on this question. Nowhere is the term "prevailing party" defined, and it is unclear from the language of the Act whether a plaintiff who succeeds on some claims but not others, is a prevailing party as to the entire case, or only for the particular claims on which he succeeds.

The purpose of § 1988 is obviously not advanced by encouraging litigants to bring claims which are wholly without merit. A prospective § 1983 plaintiff should not be encouraged to file a "kitchen sink" complaint by adding to his meritorious claims others which have no merit or likelihood of success. Conversely, the Congressional intent would be frustrated if plaintiffs were discouraged from raising claims, which, although potentially meritorious, may ultimately be unsuccessful. The policies underlying § 1988 require us to weigh these competing concerns, and strike the fine balance which will neither encourage frivolous claims to be brought in conjunction with substantial ones, nor discourage parties from raising issues where the likelihood of success is uncertain.

The case law has recognized these competing policies. In *Seigal v. Merrick,* 619 F.2d 160, 165 (2d Cir.1980) we allowed a prevailing party to recover his full attorney's fees, although he only prevailed on some of the issues raised. We noted, "[t]o reward only the pursuit of a successful theory ... undercompensates the inevitable exploratory phase of litigation, and may also invite overly conservative tactics or even prevent some high risk but deserving actions entirely." [16] *See also Planned Parenthood Association of Kansas City v. Ashcroft,* 655 F.2d 848 (8th Cir.1981), *cert. granted,* 456 U.S. 988, 102 S.Ct. 2267, 73 L.Ed.2d 1282 (1982).[17] Other courts, however, have approved reductions in requested fee awards where the plaintiff did not prevail on some claims. *See, e.g., Robinson v. Kimbrough,* 652 F.2d 458, 466–67 (5th Cir. 1981); *Nadeau v. Helgemoe,* 581 F.2d 275 (1st Cir.1978).

 A crucial factor underlying the determination whether a full award of at-

---

**16.** *Seigal v. Merrick,* concerned a shareholder's objection to settlement of a derivative action. The legislative history of § 1988, however, indicates that the standard for attorney's fee awards in civil rights actions should be the same as that for fee awards in other cases. "It is intended that the amount of fees awarded under S. 2278 be governed by the same standards which prevail in other types of equally complex Federal litigation." S.Rep. No. 1011, 94th Cong., 2d Sess. at 6 (1976), *reprinted in* 1976 U.S.Code Cong. & Ad.News, 5908, 5913.

**17.** One of the issues raised before the Supreme Court in *Planned Parenthood* is whether the lower court erred by not reducing the attorney's fee award to account for the claim upon which the plaintiff did not prevail.

torney's fees is appropriate where a party has succeeded on only some of his claims, is the degree to which the meritorious claims are clearly separable from the unsuccessful ones. In some cases they may be divisible, as with McCann's Eighth Amendment claim and his asserted due process violations. Where the claims are separable, and one or more are found to be without merit, then the district court should decline to award that portion of the requested fees which relate to the unsuccessful claim.[18] This rule serves the purpose of discouraging parties from adding insubstantial or frivolous claims to potentially legitimate ones. Where the claims raised are not clearly divisible, for example, where a plaintiff challenges a single procedure raising alternative grounds, and the practice is found unlawful on the basis of only one ground, the court could properly decline to reduce the award of fees. A rule requiring that attorney's fee awards be reduced in such a situation could have the undesired affect of discouraging civil rights plaintiffs from advancing alternative theories in challenging a constitutionally suspect practice. The policy underlying § 1988, however, concerns not the legal theories which a party may rely upon, but rather whether he has been successful in vindicating constitutional guarantees and fundamental rights. If a particular procedure is found unlawful, the policies of the civil rights laws are furthered, regardless of whether the practice is held unconstitutional on the basis of one or several of the grounds raised.

In the instant case, the district court noted that a reduction in the fee request would ordinarily have been granted. The court, however, declined to make an adjustment in the requested fee award, noting that the respected Cravath firm could have petitioned for compensation at twice the $60 hourly rate it requested. Accordingly, the district court concluded it would be useless to reduce the fee request to reflect the time spent on McCann's unsuccessful claims. If a law firm petitions for compensation at a particular hourly rate, then that rate, if reasonable, should establish the threshold against which adjustments are made. Cravath could have requested compensation at a higher rate, but failed to do so for principled reasons. The district court could not, however, speculate on the rate it might have requested, and use that figure as a benchmark against which adjustments could be measured.

The rate at which attorneys may be compensated pursuant to § 1988 is not necessarily the rate which a law firm's clients are charged for services that are in all likelihood substantially different. This is particularly so with a leading firm such as Cravath. The language of § 1988 authorizes the district court to allow "a reasonable attorney's fee" to successful civil rights litigants. Reasonableness should be measured according to the normal rate in the legal community for substantially similar work by competent practitioners. The district court may also consider the complexity of the legal issues raised and other relevant factors in determining the size of a fee award, see *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974),[19] but is not bound by the rate which a lawyer charges his other clients. *See* S.Rep. No.

---

**18.** The requested fee award should be reduced by calculating the actual number of hours spent pursuing the unsuccessful claims. It would be arbitrary to mechanically adjust the fee award by considering only the proportion of claims which are not meritorious.

**19.** In *Johnson* the Fifth Circuit established a 12 factor test to be employed in calculating the size of an attorney's fee award. The factors to be considered are 1) the time and labor required, 2) the novelty and difficulty of the legal issues raised, 3) the level of skill required, 4) the preclusion of other employment by the attorney due to acceptance of the case, 5) the customary fee in the community, 6) whether the fee is fixed or contingent, 7) the time limitations imposed by the client or circumstances, 8) the amount at stake in the action and the results obtained, 9) the experience, reputation and ability of the attorney, 10) the "undesirability" of the case, 11) the nature and length of the professional relationship with the client, and 12) awards in similar cases. *See also Fountila v. Carter,* 571 F.2d 487, 496 (9th Cir. 1978); *King v. Greenblatt,* 560 F.2d 1024 (1st Cir.1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978); *Finney v. Hutto,* 548 F.2d 740, 742 (8th Cir.1977), *aff'd,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

1011, 94th Cong., 2d Sess. 6 (1976), *reprinted in* 1976 U.S.Code Cong. & Ad.News at 5913.

An additional issue confronting us is the degree of documentation which a prevailing plaintiff must provide to substantiate his fee request. The rule in this Circuit has been that a party seeking attorney's fees should provide the court with contemporaneous time records indicating, not only the number of hours worked, but also the matters involved. *See In Re Hudson & Manhattan Railroad Co.*, 339 F.2d 114 (2d Cir. 1964); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470–71, 473 (2d Cir.1974); *Beazer v. New York City Transit Authority*, 558 F.2d 97 (2d Cir.1977), *rev'd on other grounds*, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979); *Mid-Hudson Legal Services, Inc. v. G & U, Inc., supra*, 578 F.2d at 38 (2d Cir.1978). Contemporaneous time records are important for a number of reasons. The court must have a basis for checking on the requested fee and determining whether the hours claimed were productively spent.[20] Also, in cases where an adjustment in the fee petition is warranted to reflect the claims upon which a plaintiff did not prevail, the court must have some means of discerning how many hours were spent on each of the claims. Without access to daily time sheets or other documentation, this task becomes largely speculative.

Accordingly, when a party seeks an award of attorney fees in a § 1983 action, he must provide the court with contemporaneous time sheets or other documentation which will enable it to make an independent evaluation of the fee request. If there is a significant dispute over the allocation of hours to particular issues, and an adjustment in the requested fee award is appropriate because of the plaintiff's lack of success on all of his claims, the court may consider conducting a hearing so the proposed fee award may be evaluated in an adversary context.

In this case the district court should have required the submission of contemporaneous time records. On remand the court will examine such documentation and make such adjustment in the fee award as may be warranted. Grants of attorney's fees in civil rights actions serve an important and salutary purpose. Fee awards, however, must be made on the basis of adequate documentation.

## VIII.

Before concluding we should like to thank the parties for their thorough presentation of the many difficult issues raised on this appeal. We also express our gratitude to Cravath, Swaine and Moore for undertaking their representation of Vincent McCann with no concern whether it would be compensated for its efforts. Commentators have long expressed a desire to have large law firms pay their civic dues by undertaking pro bono representation of criminal defendants and indigent civil plaintiffs. It is gratifying to see a firm such as Cravath accept this case and pursue it in a thoroughly professional and vigorous manner.

The judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.

---

**20.** We, of course, do not in any way imply that the 612 hours of attorney time for which Cravath requested payment were not productively utilized. All indications point to the conclusion that they were.