Lemuel SMITH, Plaintiff-Appellant,

v.

Thomas A. COUGHLIN, III, Commissioner of the New York State Department of Correctional Services; and Charles J. Scully, Superintendent of Green Haven Correctional Facility, individually and in their official capacities, Defendants-Appellees.

No. 1156, Docket 84–2015.

United States Court of Appeals, Second Circuit.

Argued May 7, 1984.

Decided Nov. 16, 1984.

Mark B. Gombiner, New York City (Mark B. Gombiner, Robert H. Gombiner, William M. Kunstler, Kunstler & Mason, New York City, of counsel), for plaintiff-appellant.

Tarquin Jay Bromley, New York City (Robert Abrams, Atty. Gen. of the State of N.Y., Melvyn R. Leventhal, Deputy First Asst. Atty. Gen., Barbara B. Butler, Asst. Atty. Gen., New York City, of counsel), for defendants-appellees.

Before OAKES, VAN GRAAFEILAND and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

In this appeal, prisoner Lemuel Smith challenges his confinement to a special Unit of Condemned Persons in a New York State correctional facility and the various concurrent restrictions imposed on him as a result of this confinement. We agree with the district court (1) that restrictions on visits by non-lawyers in the employ of his attorney violated appellant's constitutional rights and (2) that appellant's confinement and the limitations imposed upon him pursuant to state law are not otherwise unconstitutional. 577 F.Supp. 1055. We therefore affirm the order of the district court, but we remand to allow an award of nominal damages.

## BACKGROUND

In May of 1981, Donna Payant, a Correction Officer, was murdered during her tour

of duty at Green Haven Correctional Facility (hereinafter "Green Haven"), a state prison. At the time of Payant's murder, Lemuel Smith, the plaintiff-appellant herein, was confined at Green Haven serving two twenty-five year to life sentences for second degree murder. The State of New York charged Smith with Payant's murder. In April of 1983, after a jury trial, Smith was convicted of first degree murder.[1] In June of 1983, he was sentenced to death.[2] Following this sentencing, the state acting pursuant to N.Y.Correct.Law § 650 (McKinney Supp.1983–84), transferred him to a special Unit of Condemned Persons ("UCP") at Green Haven where he was to remain until execution of his sentence. N.Y.Correct.Law § 650 provides in part:

> From the time of such delivery to such superintendent [of the prison in which the condemned person will be held], until the infliction of the punishment of death upon him, unless he shall be lawfully discharged from such imprisonment, the defendant shall be kept in a segregation unit at such state institution and no person shall be allowed access to him without an order of the court, except the officers of the prison, his counsel, his physician, a priest or minister of religion, if he shall desire one, and the members of his family.

Smith was confined to a cell in the UCP which measured approximately six feet by ten feet.[3] By stipulation the parties have agreed that the cell's lighting and ventilation were adequate. Outside the cell were a color television and an AM/FM radio to which Smith had access twenty-four hours each day. By summoning the on-duty correction officer, Smith could obtain personal or legal materials of his choice. At the end of the officer's shift, he was required to return any personal items or legal materials, but he could reobtain them from the next officer on duty.

He was permitted to leave his cell each day for exercise in a yard measuring approximately twenty yards square. He could enter the exercise yard at any time after 8:30 a.m. and remain there until approximately 3:30 p.m.

He could receive various visitors daily. He was allowed contact visits with his attorney, a nurse or doctor (one of whom saw him each day) and a priest (who weekly ministered to him). He was allowed regular non-contact visits with a prison psychiatrist, members of his family, and four additional clergy. He was not allowed visits with lay religious advisors nor was he permitted visits with friends or others—such as the press or persons employed by his attorney—except by order of the court. In addition, he was not allowed to attend congregate religious services.

---

1. N.Y.Penal Law § 125.27 (McKinney Supp. 1975) defines the crime of murder in the first degree in part as follows:

A person is guilty of murder in the first degree when:
 1. With intent to cause the death of another person, he causes the death of such person; and
  (a) Either:
       *    *    *    *    *    *
  (ii) the victim was an employee of a state correctional institution or was an employee of a local correctional facility as defined in subdivision two of section forty of the correction law, who was killed in the course of performing his official duties, and the defendant knew or reasonably should have known that the victim was an employee of a state correctional institution or a local correctional facility; or
  (iii) at the time of commission of the crime, the defendant was confined in a state correctional institution, or was otherwise in custody upon a sentence for the term of his natural life, or upon a sentence commuted to one of natural life, or upon a sentence for an indeterminate term the minimum of which was at least fifteen years and the maximum of which was natural life, or at the time of the commission of the crime, the defendant had escaped from such confinement or custody and had not yet been returned to confinement or custody . . . .

2. Conviction of the crime of first degree murder carries with it a mandatory sentence of death. N.Y.Penal Law § 60.06 (McKinney Supp.1975).

3. As explained *infra*, Smith was subsequently released from the UCP. For this reason, our discussion of the facts relates only to Smith's conditions of confinement at the time this suit was instituted.

Shortly after his confinement to the UCP, Smith commenced this action in the federal district court pursuant to 42 U.S.C. § 1983 alleging violation of his first, fifth, sixth, eighth, and fourteenth amendment rights. Specifically, he contended that his confinement to the UCP and the various associated restrictions on his behavior (1) deprived him of a liberty interest without due process of law, (2) subjected him to cruel and unusual punishment, (3) denied him equal protection of the laws, (4) denied him freedom of speech and religion, and (5) deprived him of access to the courts. Smith moved for a preliminary injunction. The parties stipulated certain facts, and the district court ordered that a hearing be held on those that remained in dispute.

During a three day hearing, Smith testified that he was dissatisfied with conditions in the UCP and that he desired contact visits with his mother, friends, and paralegal personnel, interaction with fellow inmates, the right to attend congregate religious services, and the right to keep legal papers in his cell. He also testified that he had suffered psychological damage as a result of his isolation. Two experts testified as to conditions on other death rows, as did one New York State prisoner who had previously been under sentence of death. Smith's psychiatrist testified that he was treating Smith for a minor "anxiety disorder" and that conditions in the UCP might aggravate this condition.

Defendants presented two witnesses: Arthur Leonardo, Deputy Commissioner for Facility Operations, New York State Department of Corrections, and defendant Charles Scully, Superintendent of Green Haven. They testified that the UCP had been established in accordance with the mandate of N.Y.Correct.Law § 650. They offered several explanations for the UCP's existence and the restrictions imposed on prisoners confined therein. First, they noted that because a person sentenced to death has little reason to fear ordinary disciplinary action, condemned prisoners pose a special danger to other inmates. Second, they testified that the condemned person was a likely target for attacks by inmates seeking to establish a reputation for dangerousness by harming notorious prisoners. Third, they testified that condemned persons posed a greater suicide risk.

Following this hearing, the district judge denied Smith's request for a preliminary injunction and reserved decision as to the granting of permanent relief. Both parties agreed that no further testimony was needed to resolve factual issues. Thereupon, in a thorough opinion, the district court made findings of fact and conclusions of law and ruled on Smith's request for a permanent injunction. The court denied the relief sought except that it ordered defendants to allow Smith to have non-contact visits with paralegal personnel in the employ of his attorney.

Plaintiff timely filed a notice of appeal, and this Court heard oral argument. Approximately two months after argument of the appeal, but before we had issued any decision, the Court of Appeals of the State of New York declared the statute under which plaintiff was sentenced to death unconstitutional; it vacated Smith's sentence of death; it reduced his conviction to one of second degree murder; and it remanded the case to the state trial court for resentencing. Consequently, Smith, no longer under sentence of death, was released from the UCP. These events alter somewhat the posture of the matter that we must decide. Because the district court addressed the factual situation that existed prior to Smith's release from the UCP, and because our review is consequently similarly limited, Smith's claims for injunctive relief based on those facts are now moot.[4] Therefore, we direct our discussion of this case's merits to Smith's damage claim alone.

---

**4.** Appellant's counsel has informed us that Smith is now confined to another segregation unit at Green Haven. We do *not* mean to ad-dress or foreclose, by this opinion, any claims Smith might make regarding his present confinement.

## DISCUSSION

### Due Process

On appeal, Smith first contends that his confinement to the UCP without a prior hearing deprived him of a liberty interest without due process of law. We find this argument to be without merit.

The United States Constitution does not create any protected liberty interest in remaining in the general prison population. *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Sher v. Coughlin*, 739 F.2d 77 (2d Cir.1984). "As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). We recognize that the state by its own constitution, statutes, regulations, or judicial decisions may create a protected interest in remaining within the general prison population. *Hewitt v. Helms*, 103 S.Ct. at 869–71. However, in light of N.Y.Correct.Law § 650, which expressly mandated his confinement, appellant had no basis to claim to be the beneficiary of any state-created liberty interest. Appellant contends that in *McCann v. Coughlin*, 698 F.2d 112 (2d Cir.1983), we held that New York, through 7 N.Y.C.R.R. § 250, created such a protected interest in remaining in the general prison population. But that regulation applies only to prisoners who are subject to administrative or disciplinary segregation imposed under N.Y.Correct.Law § 137(6) (McKinney Supp.1983–84). Thus, whatever the merits of this argument were appellant a prisoner confined under those regulations and not subject to N.Y.Correct.Law § 650, it is irrelevant here.

### Cruel and Unusual Punishment

Plaintiff's claim that the totality of his conditions of confinement constituted cruel and unusual punishment is without merit. Though the eighth amendment bars more than physical torture, "discomfort compelled by conditions of confinement, without more, does not violate the amendment." *Jackson v. Meachum*, 699 F.2d 578, 581 (1st Cir.1983). Restraints on an inmate do not violate the amendment unless they are "totally without penological justification," "grossly disproportionate," or "involve the unnecessary and wanton infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1980) (quoting *Gregg v. Georgia*, 428 U.S. 153, 183, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859 (1976)). The district court found that Smith's "physical and mental discomforts [were] minimized to the extent permitted by security requirements" and that "Smith [was] not suffering from any psychological damage as a result of the conditions of his incarceration." Unpublished slip opinion at 10. We agree with these findings and conclude that they are dispositive of appellant's eighth amendment claims. Though appellant's confinement was accompanied by numerous restrictions, it did not violate the standards of *Rhodes, Gregg*, and their progeny. Moreover, although lengthy segregated confinement of the type considered herein, after an inordinate lapse of time, may necessitate periodic review to insure that conditions once constitutional have not become cruel and unusual, Smith's confinement to the UCP lasted approximately thirteen months. Under the circumstances presented herein, the absence of periodic review implicated no constitutional right.

### Equal Protection

Smith contends that because his incarceration in the UCP was significantly more onerous than that of other inmates convicted of murder and other crimes of violence, that confinement denied him equal protection of the laws. There are equal protection rights that survive incarceration. *See Lee v. Washington*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). However, prison administrators, when making classifications "need only demonstrate a rational basis for their distinctions." *Jones*

*v. North Carolina Prisoners' Union, Inc.,* 433 U.S. 119, 134, 97 S.Ct. 2532, 2542, 53 L.Ed.2d 629 (1977). Here, the appellees have proffered several reasons that demonstrate a rational basis for their special classification and treatment of appellant. Smith has proven himself a particularly dangerous person by murdering a prison guard while already serving two life terms. Once sentenced to death, it was not unreasonable to conclude that Smith was unlikely to be deterred from violent behavior by the threat of ordinary sanctions. Moreover, as Leonardo and Scully testified, Smith was himself a likely target for acts of violence committed by prisoners seeking a reputation in the prison setting for dangerousness or "toughness." And finally, as Smith himself admitted, he was depressed. There was testimony, apparently credited by the court below, that condemned persons pose a greater risk of suicide. Reviewing these justifications, we conclude that N.Y.Correct.Law § 650 is rationally related to the above-discussed concerns and thus did not deny appellant equal protection of the law.

### Freedom of Speech and Free Exercise of Religion

Smith contends (1) that limits on visitation rights impermissibly restricted his freedom of speech and (2) that the prison officials' refusal to allow Smith to attend congregate religious services deprived him of the right to freely exercise his religion. Concluding that the restrictions placed on Smith are not impermissible under the first amendment, we reject these claims.

### A. Visitation Rights

■ "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). However, "challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system." *Id.* Moreover, in reviewing the justifications stated by prison officials, we are mindful that "[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and [that], in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id.* 827, 94 S.Ct. at 2806. Here, prison officials argued that to permit visitors other than those allowed or to permit contact visits with persons other than plaintiff's priest, lawyer, and doctor would have (1) disrupted proper prison administration by increasing outsider traffic within the prison, (2) created security risks, and (3) increased the possibility that a visitor would introduce contraband into the prison. The district court found these claims to be justified, and reviewing the record, we cannot conclude that the prison officials exaggerated their response to these considerations, or that the district court was wrong.

Moreover, we note that appellant was allowed numerous visitors including family members, lawyers, doctors, and clergy. He could communicate with any or all of these persons, and through them, could communicate with the world beyond the prison walls. As the Supreme Court stated in *Pell,* limits on visitation rights "cannot be considered in isolation but must be viewed in the light of the alternative means of communication permitted under the regulations with persons outside the prison." 417 U.S. at 823, 94 S.Ct. at 2804. Considering the alternative means of communication that were available to appellant through those persons with whom he could visit and the justifications put forth by prison officials, we conclude that the restrictions on Smith's visiting rights did not violate the first amendment. *Accord Ramos v. Lamm,* 639 F.2d 559 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981) (holding similar restrictions on general population inmates constitutional); *Wilson v. Nevada Depart-*

*ment of Prisons,* 511 F.Supp. 750 (D.Nev. 1981) (same).

### B. Free Exercise of Religion

■ We now turn to appellant's claim that his inability to attend congregate services prevented him from freely exercising his religion. We have evaluated this claim also under the *Pell* framework. Having already concluded, in reviewing Smith's equal protection claims, that there existed good reason to separate him from the general prison population, we also find that the security interests cited in that context are controlling here. These interests fully justified appellees' refusal to allow Smith to attend congregate religious services, and the restriction thus did not violate his first amendment rights.

### The Sixth Amendment

Appellant makes two claims under the sixth amendment. First, he argues that the UCP's conditions of incarceration in time would have weakened his will to live and thus, in effect, have forced him to surrender his right to appeal. Second, he claims that the ban on visits by non-lawyers employed by his attorney denied him effective assistance of counsel.

■ As to appellant's first claim, the district court found no evidentiary basis for his claimed psychological debilitation. We perceive no reason to disagree with this finding, and we thus dismiss appellant's first argument as meritless.

■ Considering appellant's second argument—that appellees' refusal to allow him to see paralegal personnel denied him effective assistance of counsel—we agree with the district court that this claim is meritorious. *See Procunier v. Martinez,* 416 U.S. 396, 419–21, 94 S.Ct. 1800, 1814–15, 40 L.Ed.2d 224 (1974). We thus affirm the district court's holding as to this contention.

■ We note, however, that the district court failed to make a finding as to, or an award of, damages for violation of appellant's sixth amendment rights. This was

error. Under *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), appellants cannot raise a defense of qualified immunity because their actions did "violate clearly established ... constitutional rights of which a reasonable person would have known." See *Procunier v. Martinez,* 416 U.S. at 419–21, 94 S.Ct. at 1814–15, which clearly established—eight years before Smith's incarceration in the UCP—the right appellees violated here.

Upon review of the record, we find that appellant offered no proof of actual damages suffered as a result of any denial by appellees of his sixth amendment rights. Since the central purpose of the damage provision of 42 U.S.C. § 1983 is to compensate persons for injuries caused by deprivation of constitutional rights, a court may not award compensatory damages absent proof of actual compensable injury. *Carey v. Piphus,* 435 U.S. 247, 253–67, 98 S.Ct. 1042, 1046–54, 55 L.Ed.2d 252 (1978); *McCann v. Coughlin,* 698 F.2d 112, 126–27 (2d Cir.1983). However, even when a litigant fails to prove actual compensable injury, he is entitled to an award of nominal damages upon proof of violation of a substantive constitutional right. We therefore remand to the district court so that it may enter an award for nominal damages in the amount of one dollar. *See Carey v. Piphus,* 435 U.S. at 267, 98 S.Ct. at 1054.

### CONCLUSION

We conclude that, with the exception of the ban on paralegal visits which violated the sixth amendment, appellant's confinement to the UCP and the conditions imposed on him therein were constitutional. We therefore affirm the judgment of the court below. However, we remand to the district court so that it may award nominal damages, in the amount of one dollar, for appellees' violation of appellant's sixth amendment rights.