McHugh, J.
I. INTRODUCTION
In this action, plaintiff, a Departmental Disciplinary Unit (“DDU”) inmate at the Massachusetts Correctional Institution at Cedar Junction (“MCI — Cedar Junction”), challenges conditions and restrictions by prison authorities, including prohibitions against wearing a cross and participating in group religious services, and what he claims are the authorities’ failure to provide a trained law librarian.
II. BACKGROUND
Plaintiff, Richard Tolbert, is currently serving several concurrent sentences at MCI-Cedar Junction, where he is confined to the DDU. The defendants axe the administrators of the prison and the DDU. The DDU houses inmates who have been found guilty of committing the most serious disciplinary offenses within the Department of Corrections. Because of the security risk posed by DDU inmates, their activities and conditions are more restricted than that of the regular prison population.
In his Amended Verified Complaint, plaintiff alleges a series of unlawful actions by the defendants. Specifically, plaintiff complains that, with respect to the DDU: (1) defendants have failed to provide an adequate law library in the DDU with adequately trained staff to assist plaintiff; (2) defendants violate plaintiffs First Amendment rights by prohibiting him from possessing or wearing a cross or medallion; (3) defendants offend due process by barring appeals to DDU sanctions; (4) the defendants’ sanction extending plaintiffs DDU sentence by 30 days for not appearing for an obligatory review violates 103 CMR430; (5) the policy restricting plaintiffs correspondence with inmates not at MCI-Cedar Junction violates G.L.c. 127, §87; (6) plaintiffs collateral punishment for not attending departmental disciplinary reviews constitutes double jeopardy; (7) barring plaintiff from group religious services violates his First Amendment rights; (8) the DDU policy prohibiting postage stamps to be mailed to plaintiff, whose account was frozen at time of complaint, is illegal; (9) plaintiffs loss of yard privileges was an illegal sanction.
Defendants move to dismiss, or, alternatively, for summary judgment. Plaintiff also moves for summary judgment.
III.DISCUSSION
1. The library and librarian.
The plaintiff asserts that, although the DDU has a legal research area, defendants have failed to provide the DDU with an adequate law library and an adequately trained staff.
Plaintiffs right to adequate legal research facilities is rooted in his constitutional right of access to the courts. Bounds v. Smith, 430 U.S. 817, 828 (1977). In Bounds, the Supreme Court of the United States held that
. . . the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.
Id. Where an adequate law library is available to prisoners, courts have found that prisoners’ right of access to courts is satisfied. See id. at 824 (prisoners’ right of access to courts was violated where sole prison library in state was “severely inadequate” and no other legal assistance was available to inmates). At least where an adequate library exists, however, there is no separate right to the assistance of trained staff. See Bounds v. Smith, 430 U.S. at 828 (prison authorities need only provide either an adequate law library or other assistance).
The DDU Orientation Booklet provides that DDU inmates may request from the prison’s main law library materials that are unavailable in the DDU legal research area. Plaintiff does not argue that the main law library at MCI-Cedar Junction is inadequate or that he has ever been denied a request to obtain materials from it. The fact that the books he needs are *329 not in the DDU itself, therefore, is of no consequence, for, as long as books are reasonably available, there is no constitutional right to have them in a given place or to have them constantly at the ready.
2.The prohibition against wearing or possessing a cross or medallion
Plaintiff has no right to wear or possess a cross or medallion. The DDU Inmate Orientation Booklet limits inmates’ personal property, other than linens, writing materials, and clothes, to a wristwatch and wedding band. This restriction is justified by the defendants’ security interests and by 103 CMR403.09,[2] whichhas the force of law. See Royce v. Commissioner of Correction, 390 Mass. 425, 427 (1983).
“Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional securiiy.” Hewitt v. Helms, 459 U.S. 460, 472 (1983). “[LJawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.” Scara v. Ponte, 638 F.Supp. 1019, 1022 (D. Mass. 1986), quoting Pell v. Procunier, 417 U.S. 817, 822 (1974). That is so even if religious freedom is involved. See Little v. Norris, 787 F.2d 1241 (8th Cir. 1986).
Limitations on the type and kind of personal property an inmate may possess in the DDU is an important means for maintaining safely among a group of inmates particularly likely to pose a security threat. It takes no particularly active imagination to see that metal crosses and medallions may, with sufficient effort and enterprise, be transformed into weapons. The plaintiffs contention that his First Amendment right has been violated thus fails.[3]
3.The DDU sanctions
Plaintiff next attacks sanctions imposed as a results of his failure to appear at his monthly DDU review. Specifically, plaintiff alleges that defendants confiscated his television and radio, and extended his DDU sentence 30 days without a hearing or appeal and that they did so in violation of an unspecified section of 103 CMR 430.
The DDU Inmate Orientation Booklet clearly notifies DDU inmates of their obligation to appear for monthly reviews, and the consequences of noncompliance. “An inmate’s refusal to attend his monthly review -will result in not being credited the previous month’s DDU time, as well as loss of all previously earned privileges (i.e. radio, TV . . .).”
Plaintiff does not deny that he failed to appear for the required interview. Instead, he asserts that (a) the lack of a right to appeal DDU sanctions offends due process, (b) the sanction constitutes double jeopardy, and (c) the 30 day extension violates 103 CMR 430. None of these arguments has merit. Plaintiff, however, does not suggest what there was for him to appeal. He knew that he was required to appear, knew that he had not appeared and knew in advance the sanction, or at least the permissible sanctions, for not appearing. The sanctions impose a new punishment for a new offense and thus do not offend concepts of double jeopardy even if those concepts were otherwise applicable in this context.
In addition, plaintiff has no due process claim arising out of his extended term in the DDU because he has no protected liberty interest in remaining in the general prison population. The United States Constitution does not create any protected liberty interest in remaining in the general prison population. Hewett v. Helms, 459 U.S. at 466-67. “As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate’s treatment by prison authorities to judicial oversight.” Smith v. Coughlin, 748 F.2d 783, 787 (2d Cir. 1984), quoting Montanye v. Haymes, 427 U.S. 236, 242 (1976).
4.Correspondence restrictions
Plaintiff next challenges the policy restricting his correspondence with inmates not at MCI-Cedar Junction on grounds that the restriction violates G.L.c. 127, §87. That statute provides:
(b) Every inmate of a correctional institution or any other penal institution in the commonwealth shall be allowed, consistent with such regulations as are necessary to protect legitimate governmental interests, to send mail to persons [other than certain government leaders and employees listed in (a) to whom inmates can send correspondence].
The commissioner shall promulgate rules and regulations to effectuate the purpose of this section.
The restricted correspondence rule applicable to plaintiff has two goals, security and punitive deterrence. Similar restrictions have been upheld by the Supreme Court of the United States, because “communication [among] felons is a potential spur to criminal behavior: this sort of contact frequently is prohibited even after an inmate has been released on parole.” Turner v. Safley, 107 S.Ct. 2254, 2263 (1987). See also Little v. Norris, 787 F.2d 1241, 1243 (8th Cir. 1986) (upholding disciplinary withholding of personal mail for 30 days as means of promoting prison security) . The regulation at issue is valid as it is reasonably related to legitimate penological interests. See Turner v. Safley, 107 S.Ct. at 2261.
Plaintiffs claim that defendants unlawfully withheld magazines fares no better. The magazines were withheld because he could not pay for them. He could not pay for them because his prison account was frozen. His account was frozen because he owed the Commonwealth money for prison property he de *330 stroyed. He simply has no claim arising out of withheld magazines.
5. Denial of attendance at and participation in group religious services
Prison authorities defend the policy barring plaintiff from participating in group religious services on the ground that DDU inmates pose a threat to the institution’s security, safety, and order. Inmates’ rights to religious freedom are guaranteed by the First and Fourteenth Amendments to the United States Constitution. Both G.L.c. 127, §88 and 103 CMR 471.07 balance this right against the need for prison security. 103 CMR 471.07 provides that
[t]he Superintendent of each institution or his/her designee shall not abridge the rights of inmates to practice their religious beliefs . . . Provided that these activities do not threaten the safety, security and orderly running of the institution.
(3) Limitation of Access — The Superintendent or his/her designee may limit religious programs, practices or services if such would threaten the security, safety or well-being of the institution . . . and where there are specific facts to substantiate the threat. . .
Similarly, G.L.c. 127, §88 provides as follows:
An inmate of any prison . . . shall not be denied the free exercise of his religious belief and the liberty of worshiping God according to the dictates of his conscience in the place where he is confined . . . This section shall not be so construed as to impair the discipline of any such institution so far as may be needful for the good government and the safe custody of its inmates . . .
When an institutional restriction infringes upon a specific constitutional guarantee, the restriction must be evaluated in light of the central objective of prison administration, i.e., safeguarding institutional security. Jackson v. Hogan, 388 Mass. 376, 381 (1983). As a consequence, prisoners’ exercise of religious freedom may be restricted by reasonable prison security requirements. Little v. Norris, 787 F.2d at 1244. In this area, as elsewhere, prison officials have broad discretion. Id. At 1244. See G.L.c. 127, §88.
Massachusetts courts have upheld prison authorities’ determinations that certain segregated inmates would pose a threat to security if allowed to attend or participate in group religious services. See Jackson v. Hogan, 388 Mass. at 381-82 (no First Amendment violation where inmate’s security status precluded his attendance at group religious services). Federal court rulings are consistent with this principle. See Little v. Norris, 787 F.2d at 1244; Smith v. Coughlin, 748 F.2d at 789 (same). Plaintiffs status as a DDU inmate and his repeated disciplinary problems he has posed support the decision to bar him from group religious services.
6. The DDU policy prohibiting Plaintiffs receipt of mailed postage stamps and Plaintiffs loss of yard privileges
Plaintiff complains that defendants punished him by prohibiting him from receiving postage stamps that were mailed to him while his prison account was frozen.[4] DDU inmates can possess not more than two books of postage stamps but both must be purchased by the prison’s mail officer. Other stamps are prohibited because of a risk that they may contain certain illicit drugs.
The stamp restriction is yet another legitimate means of furthering prison security. See Little v. Norris, 787 F.2d at 1243 (prohibition against receipt and use of postage stamps was constitutional because based on policy to eliminate exchange of contraband among inmates). The frozen status of plaintiffs prison account does not transform this lawful restriction into a prohibited practice.
Similarly, plaintiff cannot prevail on his claim that defendants’ denial of his yard privileges for periods of up to four weeks is illegal. As a DDU inmate, plaintiff has no right to be in the yard. See Libby v. Commissioner of Correction, 385 Mass. 421, 432 (1982) (no violation of Eighth Amendment or Art. 26 of Massachusetts Declaration of Rights where inmate was temporarily confined without outdoor exercise). Rather, the defendants have wide discretion to impose the restriction for security reasons. See 103 CMR 429.09(2) (h).

ORDER

In light of the foregoing, it is hereby ORDERED that defendants’ Motion for Summary Judgment should be, and it hereby is, ALLOWED. Judgment will enter dismissing the Complaint.

 103 CMR 403.09 lists the minimum personal property allowed prison inmates. The list does not include crosses or medallions.

Plaintiff misplaces reliance upon Campos v. Coughlin, 854 F.Supp. 194 (S.D.N.Y.). Plaintiffs in that case challenged the prison regulation ban on nontraditional religious articles, such as Santería beads, while permitting traditional items such as crosses. The instant case is easily distinguishable from Campos in that, here, plaintiff is confined to a security unit with greater restrictions upon personal property than those imposed upon the general prison population.

Defendants froze plaintiffs account for a period before he paid for prison property he had destroyed. When inmates are found guilty of a disciplinary offense, the prison’s disciplinary board, pursuant to 103 CMR 430.25, can order the inmate to pay restitution for damages the inmate has caused. If the inmate refuses to pay, then prison authorities can freeze the inmate’s personal account under 103 CMR 405.17.