18-337-cv
Cho v. City of New York

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

───────────

August Term, 2018

(Argued: September 27, 2018     Decided: December 11, 2018)

Docket No. 18-337-cv

───────────

SUNG CHO, Individually and on behalf of all others similarly situated,
NAGLE WASHRITE LLC, Individually and on behalf of all others similarly situated,
DAVID DIAZ, Individually and on behalf of all others similarly situated,
JAMEELAH EL-SHABAZZ, Individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants*,

— v. —

CITY OF NEW YORK, MAYOR BILL DE BLASIO, in his official capacity as Mayor of the City of New York, NEW YORK CITY POLICE DEPARTMENT, POLICE COMMISSIONER JAMES P. O'NEILL, in his official capacity as New York City Police Commissioner, NEW YORK CITY LAW DEPARTMENT, ZACHARY W. CARTER, in his official capacity as Corporation Counsel of the City of New York,

*Defendants-Appellees*.

───────────

B e f o r e:

HALL, LYNCH, and CARNEY, *Circuit Judges*.

Plaintiffs-Appellants Sung Cho, Nagle Washrite LLC, David Diaz, and Jameelah El-Shabazz appeal from the dismissal of their case in the United States District Court for the Southern District of New York (Andrew L. Carter, *Judge*) for lack of subject matter jurisdiction. Plaintiffs instituted this action under 42 U.S.C. § 1983, complaining that their constitutional rights were violated when they were coerced by New York City officials into signing settlement agreements waiving various constitutional rights in order to avoid eviction from their businesses and residences. Because their settlement agreements were "so-ordered" by judges in the state-court system, the district court concluded that it lacked jurisdiction under the *Rooker-Feldman* doctrine, which prohibits federal-court jurisdiction over cases that are *de facto* appeals from unfavorable state-court judgments. Because plaintiffs' alleged injuries were not caused by proceedings in state court, we VACATE the judgment of the district court and REMAND for further proceedings.

---

> ROBERT EVERETT JOHNSON, Institute for Justice, Arlington, VA, (Darpana M. Sheth, Institute for Justice, Arlington, VA, *on the brief*), for *Plaintiffs-Appellants*.
>
> JOHN MOORE, Assistant Corporation Counsel (Richard Dearing, Jane L. Gordon, *on the brief*), for Zachary W. Carter, Corporation Counsel, New York, NY, *for Defendants-Appellees*.

---

GERARD E. LYNCH, *Circuit Judge*:

This case requires us to consider the application of the *Rooker-Feldman* doctrine where plaintiffs complain of injuries flowing from settlement agreements that were "so-ordered" by state-court judges. Plaintiffs-Appellants

2

Sung Cho, Nagle Washrite LLC (Cho's business entity), David Diaz, and

Jameelah El-Shabazz appeal from a judgment in the United States District Court

for the Southern District of New York (Andrew L. Carter, *Judge*) dismissing their

complaint. Plaintiffs-Appellants are all individuals or businesses that were

subject to eviction based on New York City's Nuisance Abatement Law, N.Y.C.

Admin. Code §§ 7-701 *et seq.*, and had agreed to settle eviction proceedings

brought by the City, rather than to litigate the nuisance charges. Defendants-

Appellees are the City of New York, New York City Mayor Bill de Blasio in his

official capacity, the New York City Police Department, New York City Police

Commissioner James P. O'Neill in his official capacity, the New York City Law

Department, and Zachary W. Carter, Corporation Counsel for the City of New

York, in his official capacity (collectively, the "City"). The district court dismissed

plaintiffs' claims for lack of subject matter jurisdiction, concluding that they were

barred by the *Rooker-Feldman* doctrine. *Cho v. City of N.Y.*, 2018 WL 401512

(S.D.N.Y. Jan. 12, 2018).

The single question on appeal is whether the district court's *Rooker-Feldman*

ruling was erroneous. Plaintiffs argue that only one of *Rooker-Feldman*'s four

requirements is met and that therefore the case should proceed. Essentially, they

3

maintain that *Rooker-Feldman* should not bar jurisdiction where, as here, plaintiffs' alleged injuries were merely *ratified* by the state-court judgments rather than *caused* by them.

As explained below, we agree that plaintiffs complain of injuries that were merely ratified by the state-court judgments, and not, as required by *Rooker-Feldman*, caused by them. Since *Rooker-Feldman* bars district court jurisdiction only when all four of its requirements are met, it was therefore error for the district court to dismiss for lack of jurisdiction.

Accordingly, we VACATE the judgment of the district court and REMAND this case to the district court for further proceedings.

**BACKGROUND**

This appeal arises out of events that occurred when plaintiffs were charged with violating New York City's Nuisance Abatement Law, N.Y.C. Admin. Code §§ 7-701 *et seq.* (the "Ordinance").[1] The plaintiffs entered into settlement

---

[1] Because a court that rules on a defendant's motion to dismiss a complaint "must accept as true all of the factual allegations contained in the complaint," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007) (internal quotation marks omitted), we describe the facts as alleged in the complaint, drawing all reasonable inferences in the plaintiff's favor, *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015), and construing any ambiguities "in the light most favorable to upholding the plaintiff's claim,"*Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016).

4

agreements with the City rather than defend themselves in court; each one of their agreements was subsequently "so-ordered" in state court. They now bring claims in federal court under 42 U.S.C. § 1983.

Enacted in 1977 to address concerns that various illegal activities were "detrimental to the health, safety, and welfare of the people of the city and of the businesses thereof and visitors thereto," the Ordinance allows the City to close a residence or business for up to one year when it can show, by a preponderance of the evidence, that certain enumerated offenses – such as drug crimes, stolen property offenses, prostitution, or obscenity – occurred on the premises. *Id.* §§ 7-701, 7-703. The Ordinance further allows the City's Corporation Counsel to bring an action in state court to permanently enjoin public nuisances and to enjoin the person or persons "conducting, maintaining, or permitting the public nuisance" from so doing. *Id.* § 7-706. Furthermore, at the time of the events that transpired here, the Ordinance allowed the City to initiate an eviction action by obtaining an order closing the premises in an *ex parte* proceeding if it could show "by clear and convincing evidence" that one of the enumerated nuisances is "being conducted, maintained or permitted" on any given property, without prior notice or

5

opportunity to be heard. *Id.* § 7-710 (2016).[2] These temporary closing orders functioned, practically, as eviction notices. Once such an action was initiated, a hearing would be held within three business days, at which hearing the court would decide whether the premises should remain closed throughout the course of litigation. *Id.*

At the time of the relevant events, the Ordinance allowed for the issuance of a temporary closing order regardless of the culpability of the defendant residents and business owners. *See, e.g., City of New York v. Castro*, 559 N.Y.S.2d 508, 509 (1st Dep't 1990). Thus, the actions were frequently referred to as "no-fault evictions."[3] The complaint alleges that in practice the Ordinance allowed the City to easily obtain temporary closing orders and that each of the plaintiffs discovered they were evicted without notice, months after any alleged criminal activity occurred on their premises.

---

[2] The Ordinance has since been amended and no longer allows *ex parte* temporary closing orders to issue where the nuisance is created by the sale of drugs or stolen goods. N.Y.C. Admin. Code § 7-710.

[3] The Ordinance has also since been amended to allow a defense where a defendant "was not aware of, should not have been aware of, and had no reason or duty to be aware of the public nuisance addressed by such disposition or order." N.Y.C. Admin. Code §§ 7-725, 7-726.

More specifically, the named plaintiffs allege the following: Sung Cho, a laundromat owner, claims that the NYPD conducted sting operations on his premises in which it used his laundromat to sell purportedly stolen electronics on two separate occasions. Cho claims that several months after these sting operations, he received a notice evicting him from his business and imposing $1,000 per day in civil fines. A hearing was scheduled, but Cho settled with the City the day before, understanding that even if he was able to prove that neither he nor his employees had any involvement with the alleged criminal conduct, his innocence would not provide a defense against the injunction.

The second named plaintiff, David Diaz, tells the following story: He and his family members were arrested after cocaine was found in his apartment. No charges were brought, however, against either Diaz or any member of his family. Four months later, he returned home to a notice of eviction. Like Cho, Diaz settled with the City rather than try to defend the litigation; the complaint alleges that the City's lawyer (whom he mistakenly thought was acting on his behalf) told him that it would be "risky" to fight the eviction action, and that he therefore decided not to take that risk, given the fact that he had an infant daughter. J.A. 30–31.

The third named plaintiff, Jameelah El-Shabazz, alleges as follows: She and her son, Akin, were mistakenly arrested for drug possession when authorities found paper cups of what was later determined to be crushed eggshells in her apartment. El-Shabazz and her son sued the City for wrongful arrest, and the City settled the suit by paying them $37,500. Four months after the arrest (and one month after the settlement), El-Shabazz received an eviction notice based on an affidavit from an NYPD officer who claimed (as had been since disproved) that drugs had been found in her apartment. Like the other two plaintiffs, she settled rather than defending the case.

The plaintiffs assert that the settlement agreements that they entered into with the City required them to waive various constitutional rights. Cho's agreement required him to waive his right to a hearing if accused of further violations, consent to future warrantless inspections, and install a camera surveillance system to which the NYPD could have ready access. Diaz's agreement required him to bar all of his family members – except for his infant daughter – from ever entering his apartment. El-Shabazz's agreement required her to permanently exclude her son Akin from the apartment. Each plaintiff

8

further alleges that his or her waiver of constitutional rights was not knowing and voluntary and that he or she was pressured into settling by the City's attorneys.

Importantly for purposes of this appeal, after the plaintiffs signed their settlement agreements, each of the agreements was "so-ordered" by justices of the Bronx and New York County Supreme Courts, and the nuisance actions were dismissed. There were no further state-court proceedings.

On October 12, 2016, plaintiffs filed a federal lawsuit in the Southern District of New York, seeking declaratory and injunctive relief on behalf of themselves and a putative class. Specifically, they alleged that "City attorneys use the[] eviction actions to compel property owners and leaseholders to enter into settlement agreements waiving constitutional rights," and that the "coercive settlement agreements violate the Fourteenth Amendment." J.A. 16. They asked the court to permanently enjoin defendants from enforcing the agreements, to declare the "agreements exacted" to be "unconstitutional, invalid, and unenforceable," and to award nominal damages. J.A. 66–67.

In response, defendants moved to dismiss for a number of reasons including, *inter alia*, statute of limitations and failure to state a claim. At oral argument on the motion to dismiss, the district court *sua sponte* raised concerns

about its jurisdiction, citing the *Rooker-Feldman* doctrine, and asked the parties for supplemental briefing on that issue. Upon review, the district court held that the *Rooker-Feldman* doctrine barred jurisdiction and thus dismissed the case. This appeal followed.

## DISCUSSION

When a federal suit follows a state suit, the former may, under certain circumstances, be prohibited by what has become known as the *Rooker-Feldman* doctrine. *See* 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure: Jurisdiction 2d § 4469.1 (2018). Our review of a district court's application of *Rooker-Feldman* is de novo. *See, e.g., Green v. Mattingly*, 585 F.3d 97, 101 (2d Cir. 2009).

## I. The *Rooker-Feldman* Doctrine

The *Rooker-Feldman* doctrine is named for two Supreme Court cases, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). Together, those cases "established the clear principle that federal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments." *Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 84 (2d Cir. 2005). The *Rooker-Feldman* doctrine, then, emerged as a

10

response to complaints that "invited federal courts of first instance to review and reverse unfavorable state-court judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283 (2005). Since federal district courts are granted original – and not appellate – jurisdiction, cases that function as *de facto* appeals of state-court judgments are therefore jurisdictionally barred.[4]

However, beyond establishing this basic principle, *Rooker* and *Feldman* "provided little guidance on how to apply [it]." *Hoblock*, 422 F.3d at 84. Prior to the Supreme Court's decision in *Exxon Mobil*, federal courts had applied the *Rooker-Feldman* doctrine "expansively," and considered it "effectively coextensive with doctrines of claim and issue preclusion." *Id.* In *Exxon Mobil*, however, the Court noted that the "doctrine ha[d] sometimes been construed to extend far beyond the contours of the *Rooker* and *Feldman* cases," and thus had often "overrid[den] Congress' conferral of federal-court jurisdiction concurrent with jurisdiction exercised by state courts." *Exxon Mobil*, 544 U.S. at 283. The Court proceeded to considerably narrow the doctrine, holding that *Rooker-Feldman* was "confined to cases of the kind from which the doctrine acquired its name: cases brought by

---

[4] Parties who contend that adverse state judgments are flawed for reasons raising federal questions may, of course, seek review in the Supreme Court, which has appellate jurisdiction in such matters. U.S. CONST. art. III.

11

state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 284.

Much of our previous case law was thus abrogated, and we subsequently articulated that in order for a court to be deprived of jurisdiction under the *Rooker-Feldman* doctrine, four requirements must be met: (1) the federal-court plaintiff must have lost in state court; (2) the plaintiff must complain of injuries caused by a state-court judgment; (3) the plaintiff must invite district court review and rejection of that judgment; and (4) the state-court judgment must have been rendered before the district court proceedings commenced. *Hoblock*, 422 F.3d at 85.

Since *Exxon Mobil*, we have applied the *Rooker-Feldman* doctrine with some frequency to cases involving suits directly against state-court judges,[5] or in which error by state-court judges in state-court proceedings is asserted, frequently in the

---

[5] *See, e.g., Richter v. Conn. Judicial Branch*, 600 F. App'x 804, 805 (2d Cir. 2015) (*Rooker-Feldman* barred jurisdiction where plaintiff sued state-court judges alleging that judgments against her were invalid and should be overturned); *Jordan v. Levine*, 536 F. App'x 158, 159 (2d Cir. 2013) (*Rooker-Feldman* barred jurisdiction where plaintiff sued state-court judge alleging judicial misconduct); *Daigneault v. Judicial Branch, Conn.*, 309 F. App'x 518, 519 (2d Cir. 2009) (*Rooker-Feldman* barred jurisdiction where plaintiff sued state-court judges for dismissing his discrimination lawsuit).

foreclosure process.[6] As relevant to this case, when considering challenges to stipulated settlements, we have ruled that *Rooker-Feldman* acted as a procedural bar in *Fraccola v. Grow*, 670 F. App'x 34 (2d Cir. 2016), in which a plaintiff sued a state-court judge, alleging that the judge improperly so-ordered a stipulation at the *ex parte* request of the opposing party.

In contrast, we have concluded that *Rooker-Feldman* did *not* apply where a plaintiff filed a federal suit alleging that defendants' conduct during the course of a state foreclosure action violated, *inter alia*, the Fair Debt Collection Practices Act ("FDCPA"). *See Gabriele v. Am. Home Mortg. Servicing, Inc.*, 503 F. App'x 89 (2d Cir. 2012). Specifically, we held that the "alleged litigation misconduct [by defendants and their lawyers] was not the product of the state court's denial of sanctions, its judgment of strict foreclosure, or any other decision rendered, but rather, was 'simply ratified, acquiesced in, or left unpunished by [the state court judgment].'" *Id.* at 92, quoting *Hoblock*, 422 F.3d at 88.

---

[6] *See, e.g.*, *Vossbrinck v. Accredited Home Lenders, Inc.*, 773 F.3d 423, 427 (2d Cir. 2014) (plaintiff claimed that his foreclosure judgment was obtained via fraud and in error; claim barred by *Rooker-Feldman* as it would require "the federal court to review the state proceeding and determine that the foreclosure judgment was issued in error"); *Worthy-Pugh v. Deutsche Bank Nat'l Tr. Co.*, 664 F. App'x 20, 21 (2d Cir. 2016) (same).

In an analogous context, in *Sykes v. Mel S. Harris and Associates, LLC*, 780 F.3d 70 (2d Cir. 2015), we considered whether plaintiffs' alleged injuries were caused by state-court judgments, and whether therefore their suit was barred by *Rooker-Feldman*, where the plaintiff-debtors alleged that the defendant-creditors had engaged in a fraudulent scheme to obtain default judgments against them in state court. More specifically, plaintiffs alleged that defendants ran a "default judgment mill" where they engaged in a fraudulent course of conduct including submitting fraudulent documents to state courts in order to obtain default judgments. *Id.* at 75. We concluded that the case was not barred by *Rooker-Feldman*, specifically considering whether the state-court judgments caused plaintiffs' injuries, and noting that "claims sounding under the FDCPA, RICO, and state law speak not to the propriety of the state court judgments, but to the fraudulent course of conduct that defendants pursued in obtaining such judgments." *Id.* at 94–95.[7]

_____

[7] In surveying our applications of *Rooker-Feldman*, we have cited a number of unpublished summary orders. We do so not to rely on any proposition of law they might be taken to establish – by definition such orders merely apply established law to particular sets of facts. But precisely because such orders illustrate routine applications of established law, the pattern of results that they reach can provide an informative survey of the kinds of cases in which a doctrine has been found unproblematically to apply or not to apply.

## II. *Rooker-Feldman*'s Second Requirement

While all four requirements must be met in order for *Rooker-Feldman* to act as a jurisdictional bar, we have held that the second requirement – that the plaintiff complains of an injury *caused* by a state-court judgment – is the "core requirement from which the other[] [*Rooker-Feldman* requirements] derive." *Hoblock*, 422 F.3d at 87. Acknowledging that occasionally "federal suits that purport to complain of injury by individuals in reality complain of injury by state-court judgments," we developed the following formula to help guide our inquiry: "a federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it." *Id.* at 88.

On appeal here, plaintiffs allege, *inter alia*, that the state courts merely ratified rather than produced their injuries, and that therefore, the district court erred when it dismissed their suit for lack of jurisdiction. We thus begin by analyzing *Rooker-Feldman*'s "core" substantive requirement: are the injuries of which plaintiffs complain *produced* by the state-court judgments at question or

merely *ratified* by such judgments? We conclude that they are merely ratified, for reasons explained below.

## III. Plaintiffs' Alleged Injuries

First, we look to the complaint to determine the nature of the injury of which plaintiffs complain. Plaintiffs target what they describe as a "lumbering and indiscriminate law enforcement program that forces ordinary, innocent people to waive their constitutional rights without being accused, much less convicted, of a crime." J.A. 15. According to plaintiffs, the injuries of which they complain flow from the City's conduct in enforcing the Ordinance, specifically the allegedly predatory conduct of the City's attorneys. Plaintiffs complain that the "City attorneys use [no-fault] eviction actions to compel property owners and leaseholders to enter into settlement agreements waiving constitutional rights" and that the "coercive settlement agreements violate the Fourteenth Amendment." J.A. 16. They argue repeatedly that at heart, their complaint is about the *agreements themselves* and the conduct that led to them – not the judgments so-ordered by the state court.

Defendants dispute plaintiffs' argument that the injury of which they complain is caused by conduct leading to the agreements, but do concur that the

16

agreements themselves are the injury. They argue, however, that the agreements are indistinguishable from the state judgments that were filed when the state-court judges so-ordered the agreements.

The relevant case law persuades us that plaintiffs have the stronger argument. In *Sykes*, for example, we held that *Rooker-Feldman* did not bar the district court's jurisdiction where similar misconduct was alleged; specifically, the plaintiffs alleged that defendants were engaged in a "default judgment mill" to obtain state-court judgments by unlawful means. 780 F.3d at 75–76. We held that *Rooker-Feldman* did not apply, primarily because plaintiffs brought claims under the FDCPA, RICO, and state law, which we said "speak not to the propriety of the state court judgments, but to the fraudulent course of conduct that defendants pursued in obtaining such judgments." *Id.* at 94–95. Though our holding relied partially on the fact that plaintiffs' claim did not primarily target the reversal of the default judgments (the third *Rooker-Feldman* requirement), we also concluded that the state-court judgments were a mere ratification of the harm allegedly caused by defendants. *Id.*

Several courts in our Circuit have similarly held that state-court action was a mere "ratification" of the injury in similar circumstances, and thus that *Rooker-*

*Feldman*'s second requirement was not met. For example, in *Green v. City of New York*, 438 F. Supp. 2d 111 (E.D.N.Y. 2006), the plaintiffs alleged that the City had a policy of improperly inflating the amounts of liens placed against the proceeds of personal injury claims, and that the plaintiffs had relied on those amounts to their detriment in settlement agreements. The court held that the "injury plaintiffs allege was not caused by the state court judgments" but merely ratified by it. *Id.* at 121. Similarly, in *Capela v. J.G. Wentworth, LLC*, 2009 WL 3128003, at *6 (E.D.N.Y. Sept. 24, 2009), the plaintiffs claimed that defendants' alleged Truth in Lending Act violations led to plaintiffs signing court-approved settlements; the court there held that the "lawsuit [did] not complain of an injury caused by the state court order and seek that order's reversal, inasmuch as the order 'simply' approved the Purchase Agreement entered into by the parties."[8]

---

[8] Districts courts outside our Circuit have also found a mere "ratification" in similar circumstances. *See, e.g.*, *Arnett v. Arnett*, 2014 WL 2573291, at *1–2 (D. Utah June 9, 2014) (holding that a divorce settlement agreement was not itself a state-court judgment, despite being so-ordered, and finding that the state court's decree of divorce "at most only ratified, acquiesced in, or left unpunished" the settlement agreement); *In re Chinin USA, Inc.*, 327 B.R. 325 (N.D. Ill. 2005) (holding that plaintiffs' alleged injury was a fraudulent transfer flowing from a settlement agreement and not from the state-court judgment that approved that agreement).

These cases are persuasive that where, as here, plaintiffs bring claims alleging harm flowing from wrongful conduct leading to settlement terms and do not argue that the state courts committed any error in so-ordering the parties' agreements, the complaint attacks the conduct itself, and the claim does not function as a *de facto* appeal. Defendants point us towards *Fraccola*, 670 F. App'x at 34, and *Niles v. Wilshire Investment Group, LLC*, 859 F. Supp. 2d 308 (E.D.N.Y. 2012), as persuasive precedent to the contrary. However, both of those cases involved alleged judicial misconduct and/or named the judges as defendants, and thus are easily distinguishable. Accordingly, examining the complaint in the context of prior precedents of our own and of other courts, we find support for plaintiffs' argument that they are not engaged in *de facto* appeals of state-court judgments.

Plaintiffs further argue that the harm of which they complain exists separate and apart from the state-court judgments, for two reasons. First, they argue that their constitutional rights were violated when they were forced to sign the settlement agreements, whether such agreements were enforceable or not. Second, they argue that, as two of the three agreements contained in the record became enforceable as of signing, they were legally binding contracts to which

plaintiffs were bound even before the state court so-ordered them. For its part, the City considers the state-court judgments and the settlement agreements to be one and the same, arguing that it was "only in the state courts' so-ordering of those agreements that the City obtained the power to take the actions that plaintiffs claim caused them injury." Appellee Br. 28. We will consider each argument in turn.

First, plaintiffs argue that harm befell them "as soon as" the City engaged in conduct with the aim of coercing them to waive their constitutional rights; more specifically, they claim that even "[i]f the City had not *succeeded* in depriving Plaintiffs of their constitutional rights, the City's negotiating tactics *still* would have violated the Constitution and given rise – at a minimum – to a claim for nominal damages." Appellant Reply Br. 13 (first emphasis added) (citing *Amato v. City of Saratoga Springs, N.Y.*, 170 F.3d 311, 317 (2d Cir. 1999)). We agree that if plaintiffs were in fact coerced into unconstitutional waivers, they might sustain an injury regardless of the waivers' enforceability.[9] *See, e.g.*, *Smith v. Coughlin*, 748 F.2d 783, 789 (2d Cir. 1984) ("[E]ven when a litigant fails to prove actual

---

[9] Plaintiffs have, in fact, sought nominal damages of $10.00 each. J.A. 67.

compensable injury, he is entitled to an award of nominal damages upon proof of violation of a substantive constitutional right.")

Second, plaintiffs maintain that tangible harm befell them as soon as the contracts were signed. Cho signed his agreement on December 23, 2013, but it was not filed with the court until March 18, 2014. J.A. 250–56. Likewise, El-Shabazz signed her agreement on September 29, 2011, and it was not filed with the court until October 17, 2011.[10] J.A. 140–43. Since the agreements state that the "Stipulation of Settlement shall be effective immediately upon execution of the parties," and the agreements were signed significantly before they were filed with the state court, plaintiffs appear to be correct that they were bound by their terms immediately, regardless of the action of the state courts.[11] J.A. 142, 255. Especially

---

[10] The record does not disclose when the state judges actually "so-ordered" the agreements, and defendants argue that "[n]one of the injuries alleged in plaintiffs' complaint had occurred when the state courts so-ordered their settlement stipulations *on the same day plaintiffs* agreed to them." Appellee Br. 29 (emphasis added). However, the evidence in the record reveals only the dates on which the stipulations were filed with the courts.

[11] Defendants also argue that this argument is unpreserved, but the dates are part of the settlement agreements, of which the district court took judicial notice. As plaintiffs have consistently argued that the harm flowed from the agreements themselves, and not the state-court actions, we can properly consider the additional fact that the agreements were filed only some time after their signing, and that they were effective immediately upon signing. *See, e.g., United States v. Erie Cty., N.Y.*, 763 F.3d 235, 242 n.7 (2d Cir. 2014) (allowing new facts that were

21

as the agreements included provisions, for example, banning particular people from the premises (in El-Shabazz's case, her son), plaintiffs' arguments that harm befell them as soon as they signed are persuasive.[12] Moreover, even were that not the case, and the stipulations were effective only after being so-ordered by the state court, plaintiffs are still attacking the agreements themselves and the course of conduct that led to them, rather than the state courts' rulings.

The instant case thus does not entail the evil *Rooker-Feldman* was designed to prevent. Plaintiffs are attempting to remedy an alleged injury caused when, prior to any judicial action, they were coerced to settle, not an injury that flows from a state-court judgment. By allowing an action such as this to go forward, we

---

"readily available in the record below" in the service of previously-made arguments).

[12] We note that even if the agreements were enforceable only *after* they were judicially approved (as was the case with Diaz), the precedents we discuss above include many instances in which we found that state-court action was a mere "ratification," and not the cause of the injuries. *See, e.g., Sykes*, 780 F.3d at 75–76 (holding that though plaintiffs complained of defendants' conduct in creating a default judgment mill that would end in a state-court judgment, that judgment was a mere ratification); *Gabriele*, 503 F. App'x at 92 (holding that state-court action was mere ratification where a defendant's conduct was targeted at obtaining a foreclosure judgment).

do not risk turning our federal district courts into quasi-appellate courts sitting in review of state-court decisions.[13]

## CONCLUSION

For the foregoing reasons, we VACATE the judgment of the district court and remand for further proceedings.

---

[13] Plaintiffs also argue both that they are not state-court losers and that they do not seek review and reversal of any state-court judgments. Because *Rooker-Feldman* will bar jurisdiction only when all four of its requirements are met, and we have already held that the injury of which plaintiffs complain was merely ratified by the state court, we need not address those arguments.